Page 18

```
 1  give you a ball park figure.  Some of them are
 2  first-year apprentices, some of them are second
 3  year, some of them are third year, but we have
 4  about 90 to 100 people in the program.  And each
 5  year we probably take in, and this is just a
 6  guesstimate, probably 20 to 30, 40 people.
 7       Q.  So based on your experience, is it fair
 8  to say it sounds like 30 percent of the applicants
 9  are accepted into the program in recent times?
10       A.  It really depends on the people that are
11  doing the interviews and it depends on the
12  workload.  It depends on the quality of the
13  applicants that are coming in.  There are several
14  variables that we look at as an organization of
15  what we want to bring in.
16       Q.  Who would the person or what would be
17  the source that I would best go to to get that
18  information for 2004, 2005?
19       A.  To get the exact numbers would be Les
20  Louinger.  Les Louinger is the training director for
21  Alaska Laborers Training Fund and the
22  apprenticeship program.
23       Q.  Now is Les Louinger, he is not an
24  employee of Local 341?
25       A.  No, he is not.
```

Page 19

```
 1       Q.  He is an employee of that particular
 2  program alone; is that correct?
 3       A.  He is an employee of the Laborers
 4  training school and apprenticeship program.  He is
 5  a member of Laborers Local 341.
 6       Q.  When a person is accepted the into the
 7  apprenticeship program after going through the
 8  process that you've described, does that person
 9  then go through classes, through a training period
10  or sent out to a job site?
11       A.  When a person is selected, we like to
12  give them a couple of weeks minimum training.  That
13  doesn't always happen, but that is what we try to
14  do.  So rule of thumb they would get at least two
15  weeks of training and we would place them in a job
16  with a contractor and then every year they have
17  to -- I believe, the number they have is 144 hours
18  of additional training every year.
19       Q.  Now, Mr. Gallagher, you attended the
20  arbitration that is at issue in this matter; did
21  you not?
22       A.  Yes, I did.
23       Q.  June 29, 2005, does that sound about
24  right?
25       A.  It sounds about approximately, yes.
```

Page 20

```
 1       Q.  At that particular proceeding, did you
 2  detect any animosity toward the Union from Mr.
 3  Milne the arbitrator?
 4       A.  No, I didn't.
 5       Q.  At the time of the proceeding, did you
 6  know at that time he had a son that applied to the
 7  apprenticeship program?
 8       A.  No, I didn't.
 9       Q.  Why didn't you?
10       A.  I didn't know.
11       Q.  Well, isn't there a connection between
12  the apprenticeship program and Local 341?
13       A.  Between Laborers Local 341 and Laborers
14  Local 942, between us we have about 3300 members
15  and I don't know all the apprentices that belong to
16  Laborers Local 341.  I don't deal with every single
17  individual person.  I would never have that much
18  time on my hands.
19       Q.  In this proceeding you filed an
20  affidavit; do you recall doing that?
21       A.  Yes, I do.
22       Q.  In that you made this statement --
23       MS. DRYGAS:  Which?
24       MR. JOHNSON:  In the affidavit of
25  Michael Gallagher.  I don't propose to introduce it
```

Page 21

```
 1  necessarily but I can do if you like.
 2  BY MR. JOHNSON:
 3       Q.  You make the statement: "On or about
 4  July 11, 2005, I learned from Dan Simonian, the
 5  president and business agent of Local 942 in
 6  Fairbanks that the arbitrator's son Abraham Milne,
 7  failed to be selected for enrollment by the Alaska
 8  Laborers Training Trust Apprenticeship Program on
 9  two separate occasions."  Do you recall making that
10  statement in your affidavit?
11       A.  Yes, I do.
12       Q.  Was that a truthful statement?
13       A.  Yes.
14       Q.  Why did Dan Simonian mention to you that
15  the arbitrator's son, Abraham Milne, failed to be
16  selected?
17       A.  I can't remember exact word-for-word,
18  but in essence, we were discussing an arbitration
19  that we had and I told him we lost the arbitration.
20       Q.  When you were referring to the
21  arbitration, you're talking about the Steve Pope
22  arbitration that Mr. Milne --
23       A.  Yes.  And he asked me who the arbitrator
24  was and I told him and he says, Well, were you
25  aware his son has applied twice for the Laborers
```

Page 22

1  apprenticeship program and I said, no. And he
2  hasn't been selected either time.
3       And when the morning of our arbitration
4  with Mr. Pope, the arbitrator -- one of the first
5  things he said was that he had no conflicts; didn't
6  know the laborers, didn't know Anchorage Sand,
7  didn't know any of the parties. And I recall when
8  Kevin Dougherty from my general counsel -- I was on
9  vacation when he got the arbitrator's ruling. Mr.
10 Dougherty told me that we lost of arbitration they
11 ruled if favor the Anchorage Sand and Gravel. And
12 I said, Kevin, do me a favor call Steve Pope and
13 let him know and let him know that it was over.
14      This is the first time in our history we
15 have ever challenged an arbitrator. We believe in
16 the process very strongly but when we found out
17 that the arbitrator's son had not been selected two
18 times from the Laborers apprenticeship program I
19 felt there was a conflict of interest.
20      I'm a parent just like anybody else.
21 We, as parents, are very protective of our kids and
22 I believe that -- I believe he should have told us
23 about that potential conflict and I believe it is a
24 conflict.
25      Q. Let's say the arbitrator's decision

Page 23

1  would have gone the opposite direction held in
2  favor of the Union and favor of Mr. Pope and this
3  information came to your attention, what would you
4  have done?
5       A. I don't know. But it was like when we
6  were picking an arbitrator, during that process my
7  attorney Mr. Dougherty I asked him to go through a
8  process for me and I believe we had it down to two
9  arbitrators and Kevin Dougherty told me, my
10 counsel, who the names were. And I do know I
11 implied to him right away one the arbitrators, I
12 can't even think of his name right now, but I told
13 him that that arbitrator has done work for us and I
14 said make sure that the other party is aware that
15 he has worked for us.
16      Q. But you're not referring to Mr. Milne
17 are you?
18      A. No. I think it was Mr. Bledsoe or
19 something like that.
20      Q. Did you direct your counsel or yourself
21 to undertake an inquiry of Local 942 or the
22 apprenticeship program or did you undertake any
23 inquiry of them as to whether they had any
24 knowledge about Mr. Milne?
25      A. Could you repeat that, please.

Page 24

1       Q. When you heard that Mr. Milne and Mr.
2  Bledsoe were being considered as arbitrators, did
3  you run their names by officials of Local 942?
4       A. No, I didn't.
5       Q. Did you run their names by
6  representatives of the apprenticeship program?
7       A. No, I didn't.
8       Q. Did you run them by the officials of
9  Local 71?
10      A. I did not, no.
11      Q. Did you direct anybody to run those
12 names by any of Local 71 or 942 or the
13 apprenticeship program?
14      A. I never directed my counsel, but I do
15 believe my counsel talked to somebody from Local
16 71.
17      Q. But your understanding is nobody talked
18 to anybody from 942 or from the apprenticeship
19 program?
20      A. Well, let me take that back. Our
21 apprenticeship director -- I believe I had
22 conversations with him about this arbitration. So
23 let me restate what I said.
24      Q. You had conversations with him prior
25 about who the arbitrator was?

Page 25

1       A. We had discussions, but exactly what we
2  discussed, I'm not sure. I know I had discussions
3  with our training director out there about taking
4  it to arbitration. And exactly the details, I
5  can't recall.
6       Q. Well, Mr. Gallagher, you think there is
7  a conflict by Mr. Milne's failure to disclose
8  information as it related to the matter involving
9  Local 341. But Mr. Milne's son was involved in at
10 most with 942 or with the apprenticeship program;
11 is that fair to say?
12      A. I, as a trustee, set a lot of the rules
13 and policies along with several other trustees.
14 I'm a trustee on the Alaska Labor apprenticeship
15 program.
16      Q. Didn't you then have a trust obligation
17 to inquire about Mr. Milne's status with Local 942
18 with the apprenticeship program before you picked
19 him?
20      A. No, I didn't.
21      Q. Then what is the conflict? If you see a
22 conflict now, why didn't you check it out before
23 Mr. Milne was picked and went through the
24 arbitration?
25      A. It never dawned on me to call 942 or

Page 26

    check with our apprenticeship program. It never
    came to my -- I never even -- it never even popped
    into my mind. I rely on my general counsel to do a
    lot of this work for me, and I believe that if a
    person has a conflict, like I believe the
    arbitrator did, and Mr. Johnson you were there that
    morning when the arbitrator said he had no
    conflicts and no dealings with anybody in either of
    the parties. And I -- whether he did intentionally
    or not, I have no idea but --
      Q.  What party --
      A.  Can I finish?
      Q.  I'm sorry. I didn't mean to interrupt
    you, sir.
      A.  When he told us he had no dealings with
    any of us, if the arbiter would have told me that
    his son had applied for Alaska Laborers
    apprenticeship and has not been picked, not once
    but twice, I would have raised a major conflict
    because I'm a parent. I know how protective I am
    of my children. That's just a parent, we are very
    protective of our siblings (sic).
      Q.  Mr. Gallagher, I do apologize for
    interrupting you, but at the arbitration proceeding
    do you remember Mr. Milne's saying that he had no

Page 27

    conflict with Local 942? That he no conflict with
    the apprenticeship program; do you remember him
    saying that?
      A.  No, I don't know.
      Q.  Do you remember him saying he had no
    conflict with Local 341?
      A.  Yes.
      Q.  So you take the conclusion that the
    alleged relationship with 942 and the
    apprenticeship program is a critical issue in terms
    of his ability to sit on a matter involving Local
    341, why didn't you undertake an inquiry of 942 or
    the apprenticeship program to find out if there was
    some conflict?
      A.  I did not do it. I don't know why.
      Q.  Did you instruct anybody to do it?
      A.  I don't believe I did.
      Q.  When did you first hear that Clark Milne
    was being considered as a possible candidate for an
    arbitrator position in this matter?
      A.  What is the question?
      Q.  When did you first hear of Clark Milne
    as a possible arbitrator in the Steve Pope matter?
      A.  I'm not sure. It was a week or before,
    approximately, of the arbitration. I left that up

Page 28

    to my general counsel to pick the arbitrator.
      Q.  I'm going to show you what was marked as
    Exhibit 1 in the deposition of Mr. Milne. Have you
    seen that letter dated June 6, 2005?
      A.  I don't recall. I very -- I may have,
    yes. Do I recall it, no.
      Q.  Were you involved in the decision, in
    fact, to select Mr. Milne as distinct from Mr.
    Bledsoe or anyone else?
      A.  I left it up to my general counsel.
      Q.  I don't want to invade your
    attorney/client privilege, but did you talk about
    the subject of who ought to be selected with your
    general counsel?
      A.  I had discussions with my general
    counsel, yes.
      Q.  Did you offer input as to whether Mr.
    Milne was an appropriate candidate or not?
      A.  I just told him to pick somebody that
    was fair.
      Q.  Do you have any knowledge as to why
    Abraham Milne was not selected to the
    apprenticeship program in 2004, 2005?
      A.  No, I don't.
      Q.  Have you asked anybody about it?

Page 29

      A.  I have heard. I have -- I have asked
    why he was not rated high. Yes, I did ask that
    question.
      Q.  What did you hear as a response to that
    question?
      A.  You know it's been about five, six,
    seven months now. One reason, I believe, is that
    he was a little slow.
      Q.  Slow in terms of mental capacity; is
    that what you're referring to?
      A.  I'm not sure what they were referring
    to, whether it was mental or physical. I don't
    know. What it is is that it wasn't -- it was a
    selection process based on average scores and his
    score was not as high as the other applicants.
      Q.  Is that a fairly routine occurrence that
    folks are let go or not selected because their
    score is not as high as the average?
      A.  Well, if you have -- hypothetically, if
    you have 50 people applying for the apprenticeship
    program and you're going to take in 20 people, the
    top 20 people with scores would be the ones that
    you would pick. The other 30 -- and sometimes it's
    a real close call.
        Sometimes I wish had more positions

8 (Pages 26 to 29)

### Page 30

1  available because you had some good candidates, but
2  sometimes it's just the way a person interviews,
3  their knowledge of the industry, attitude.
4      Q.  Do you recall any discussions with
5  anybody whether young Mr. Milne was close in
6  meeting the cut or was he significantly under the
7  average mark of those that were accepted?
8      A.  Don't me hold me to this because it's
9  been six, seven, eight months since we have had
10 this discussion, but I believe they really wanted
11 to pick him as an apprentice, from what I gathered,
12 because he not only applied once but twice.  So he
13 was showing a lot of interest in wanting to be part
14 of the Laborers apprenticeship program.  But they
15 just didn't -- they just didn't get it done.
16     Q.  Did young Mr. Milne appeal or protest
17 the decisions at all to your knowledge?
18     A.  Not to my knowledge.
19     Q.  Is there a process to do that if one
20 wanted to do that?
21     A.  We have more appeals -- yes, we do have
22 a process.
23     Q.  But he did not appeal?
24     A.  Not to my knowledge, no.
25     Q.  To your knowledge, did his father Clark

### Page 31

1  Milne make any kind of an issue with anybody about
2  it?
3      A.  Just third -- just second-handed.  Tim
4  Sharp, my counterpart in Fairbanks, indicated that
5  he had a conversation with Mr. Milne.  I don't know
6  all the details of that conversation.
7      Q.  Was it your understanding that that
8  conversation was reflected in the affidavit that
9  Mr. Sharp provided in this litigation?
10     A.  I believe so.
11     Q.  About how long does it take, if you
12 know, between when a person is interviewed for the
13 apprenticeship program and told whether they have
14 been accepted or not?
15     A.  It varies.
16     Q.  You don't have any knowledge about that,
17 at least in 2005 if the representation is accurate,
18 that Abraham Milne interviewed in May of 2005 for
19 the Laborers apprenticeship program in Fairbanks?
20 You don't know when the rejection notices or
21 acceptance notices went out?
22     A.  No, I don't.
23     Q.  Now, Local 341 enters into a collective
24 bargaining agreement with employers as Local 341;
25 is that correct?

### Page 32

1      A.  No.  Yes and no.
2      Q.  I'm going to hand you what was marked as
3  Exhibit 2 to the Clark Milne's deposition.  Have
4  you seen that before?
5      A.  I believe so, yes.
6      Q.  Is this a Plant Agreement between
7  Laborers International Union of North America
8  AFL-CIO Alaska District State Council Laborers
9  Local 341 and AS&G?
10     A.  Yes, it is.
11     Q.  So this is a CBA, collective bargaining
12 agreement between Local 341 and AS&G; is that
13 right?  Is that what it is?
14     A.  The Alaska State District Council of
15 Laborers' Local 341.
16     Q.  Is that the full name for Laborers Local
17 341?
18     A.  We use different things under our Alaska
19 State District Counsel of Laborers, which I
20 indicated earlier is made up of three locals up
21 here; Local 942 and Local 71 and Local 341.  And we
22 use the district council's name at times like our
23 master agreement this here agreement, because it is
24 specific to our geographical area; it is negotiated
25 by Laborers Local 341.  Our master agreement is

### Page 33

1  negotiated with Local 942 and Local 341 because
2  that is a statewide agreement similar to our
3  training trust, our pension, health and welfare.
4      Q.  So while there may be a statewide
5  agreement, the one with 341 and AS&G was a local
6  agreement; is that correct?
7      A.  Yes, sir.
8      Q.  And this agreement is not between Local
9  942 and AS&G, is it?
10     A.  No, it's not.
11     Q.  And it's not between the Laborers
12 apprenticeship program and AS&G, is it?
13     A.  Yes, it is.
14     Q.  This is between the apprenticeship
15 program and AS&G?
16     A.  Anchorage Sand and Gravel contributes to
17 our apprenticeship training program.
18     Q.  While it may have an obligations even
19 under this collective bargaining agreement to
20 contribute, is this agreement actually between the
21 apprenticeship program and AS&G?
22     A.  The fringe benefits; the negotiated wage
23 that we negotiate with Anchorage Sand and Gravel.
24 Every year we go out to the membership and we ask
25 them what they want to put into the Alaska Laborers

Page 34

1  Pension Plan, Alaska Laborers Medical Plan, Alaska
2  Laborers Training Plan and Alaska Laborers Legal
3  Plan.
4       At that time those monies are then,
5  whatever we decide on what we want as contribution
6  rates to those specific plans, the contractor pays
7  into the those plans and part of that negotiated
8  wage is part of the Alaska Laborers training
9  school.
10      Q.  But in reaching that agreement, in
11 reaching an agreed upon contribution rate, that was
12 part of the collective bargaining agreement that we
13 are talking here, that has been marked as Exhibit
14 2, between Local 341 and AS&G?
15      A.  Yes.
16      Q.  The dispute that was actually being
17 arbitrated by Mr. Milne involved the termination of
18 an employee represented by Local 341, correct?
19      A.  Yes.  We are the agencies that
20 represented Mr. Pope in his arbitration, yes.
21      Q.  Local 942 didn't represent Mr. Pope?
22      A.  No.  But Kevin Dougherty actually was
23 our general counsel that works for Alaska State
24 District Council of Laborers Local 341, Laborers
25 Local 942 and Laborers Local 71.

Page 35

1       Q.  And given that Mr. Dougherty is in that
2  position, would he then have access to ask
3  questions as far as you know of Local 942 or the
4  apprenticeship program regarding information they
5  might have about a variety of issues?
6       A.  I believe he would, yes.
7       Q.  So do have you any knowledge of whether
8  Mr. Dougherty in his capacity as general counsel
9  for the District Council of Laborers in fact
10 inquired of Mr. Milne's alleged conflict status
11 with 942 or the apprenticeship program?
12      A.  The only person that I recollect that
13 Mr. Dougherty talked to was Jim Astin with Local
14 71.  That's because -- and probably the reason is,
15 and I have would have ask Mr. Dougherty, is Local
16 71 does a lot the arbitrations.  Their agents are
17 trained to do arbitrations.  Whereas, Local 942 and
18 341 we rely solely on Mr. Dougherty, at that time
19 to do our arbitration.  Mr. Dougherty has helped
20 and done arbitrations for Locals 71, but he
21 exclusively does all of ours for 341 and 942.
22      Q.  From these various sources, Local 71,
23 Local 942, the apprenticeship program and Local
24 341, nobody came up with any information, if you
25 will the Union side of the situation, about Mr.

Page 36

1  Milne's relationship with an applicant to the
2  apprenticeship program?
3       A.  Not to my knowledge.
4       MR. JOHNSON:  Thank you, Mr. Gallagher,
5  I don't have any further questions for you.
6                 EXAMINATION
7  BY MS. DRYGAS:
8       Q.  If I could just take one minute.  Mr.
9  Gallagher, I want to revisit something briefly that
10 Mr. Johnson discussed.  Les Louinger, can you
11 explain his position with the training program?
12      A.  Les Louinger is director of the Alaska
13 Laborers Training School and Alaska Laborers
14 apprenticeship program and he answers directly to
15 myself and the other trustees.
16      Q.  Okay.  So he oversees the programs that
17 are in Anchorage and Fairbanks?  He is the director
18 of those programs?
19      A.  Yes.
20      Q.  And because I think there was a little
21 bit confusion, as for the trustees that are members
22 of the Laborers Union, can you tell me who those
23 trustees are?
24      A.  There's two trustees from Fairbanks.
25 One of the trustees is Tim sharp.  He is the

Page 37

1  business manager, secretary-treasurer of Local 942.
2  Dan Simonian is the president of Local 942.  In
3  Anchorage, Ron McFeeeders is the trustee and vice
4  president of Laborers Local 341.  And, myself, Mike
5  Gallagher, businesses manager, secretary-treasurer
6  of Laborers Local 341.
7       Q.  You mentioned a name who was placed in a
8  list of our potential arbitrators for this
9  discussion, Bledsoe.  Would that be Mark Bledsoe?
10      A.  I believe that is name.
11      Q.  Why did you feel there was a conflict;
12 can you state that again?
13      A.  Approximately five, six --
14 approximately, it may have a been little longer or
15 little less, through our trust fund Mr. Bledsoe
16 represented all of our trust funds in that our
17 normal attorney which is Randy Simpson with Jermain
18 Dunnagan and Owens was conflicted out and we had to
19 get outside counsel on a collection matter.
20      We had a contractor that wasn't paying
21 their contributions to the pension, health and
22 welfare, training and legal funds.  We had to go
23 out and get counsel and Mark represented us at that
24 time, Mr. Bledsoe did, I believe it was.  And when
25 I heard that name, I disclosed it to my general