IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF ALASKA AT ANCHORAGE


LABORERS LOCAL 341,

        Plaintiff,

vs.

ANCHORAGE SAND AND GRAVEL
COMPANY, INC.,

        Defendant.
_____/

Case No. A05-250 CV (JWS)


DEPOSITION OF CLARK MILNE

Pages 1-40, inclusive

Commencing at 2:05 p.m.

Tuesday, January 31, 2006

Anchorage, Alaska


Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage, Alaska 99501-3520
Serving Alaska Since 1953

Rick D. McWilliams, RPR, Ret.    Telephone (907)276-1680
Fred M. Getty, RPR, Ret.       E-mail AkSteno@acsalaska.net
                        Fax (907) 276-8016

Page 1

Clark Milne                                    Deposition                                    January 31, 2006

---

**Page 2**

1      IN THE UNITED STATES DISTRICT COURT FOR
2         THE DISTRICT OF ALASKA AT ANCHORAGE
3
4    LABORERS LOCAL 341,
5           Plaintiff,
6    vs.
7
     ANCHORAGE SAND AND GRAVEL
8    COMPANY, INC.,
9           Defendant.
     _____/
10   Case No. A05-250 CV (JWS)
11
12
13          DEPOSITION OF CLARK MILNE,
14   taken on behalf of the defendant, pursuant to notice
15   at the offices of Wohlforth,Johnson, Brecht, Cartledge
16   & Brooking, Anchorage, Alaska, before Patta K. Johnson,
17   Shorthand Reporter for Alaska Stenotype Reporters and
18   Notary Public in and for the State of Alaska.
19
20
21
22
23
24
25

---

**Page 3**

1         A P P E A R A N C E S
2
3    For the Defendant:   WOHLFORTH, JOHNSON, BRECHT,
                            CARTLEDGE & BROOKING
4                          By:  Robert Johnson
                           900 West Fifth Avenue
5                          Suite 600
                           Anchorage, Alaska 99501
6                          907-276-6401
7    For the Plaintiff:   GENERAL COUNSEL ALASKA STATE
                            DISTRICT COUNCIL OF LABORERS
8                          By:  Heidi Drygas
                           2501 Commercial Drive
9                          Suite 140
                           Anchorage, Alaska 99501
10
11
12   Also Present:     Kevin Dougherty, General Council
                        Alaska District Council of Laborers
13
14
15
16
17
18
19
20
21
22
23   Reported By: Patta K. Johnson
24
25

---

**Page 4**

1
2              I N D E X
3
     EXAMINATION BY:                      PAGE
4
5    Mr. Johnson                          5, 32
6    Ms. Drygas                           21
7
8
9
10
11
     EXHIBITS:
12
13   Exhibit 1                            8
14   Exhibit 2                            9
15   Exhibit 3                            11
16   Exhibit 4                            12
17   Exhibit 5                            23
18   Exhibit 6                            26
19   Exhibit 7                            29
20
21
22
23
24
25

---

**Page 5**

1    Whereupon,
2              CLARK MILNE,
3    called as a witness herein having been duly sworn
4    upon oath by Patta K. Johnson, Notary Public, was
5    examined and testified as follows:
6              EXAMINATION
7    BY MR. JOHNSON:
8        Q.  Mr. Clark, for the record, please state
9             your name and spell your last name?
10       A.  My name is Clark Milne, C- l- a- r- k,
11            M- i- l- n- e.
12       Q.  What is your address, Mr. Milne?
13       A.  I live in Fairbanks, 1119 Coppet, C- o-
14            p- p- e- t, Street, Fairbanks 99709.
15       Q.  Mr. Milne, have you been involved in a
16            deposition before?
17       A.  Yes, but it has been a decade or so.
18       Q.  Just as a refresher, I'm going to ask
19            you questions and, of course, I appreciate
20   your
21            best answers to them.  You are under oath
22   and it is
23            anticipated your deposition could be used
24   at trial,
25            and, certainly, motion practice in this

---

2 (Pages 2 to 5)

Alaska Stenotype Reporters

Exhibit A, p.2

Clark Milne                          Deposition                          January 31, 2006

---

**Page 6**

1  particular
2  case.
3        If I ask a question that makes no sense,
4  if you don't understand it or it's unclear, let me
5  know and I will try to rephrase it. The
6  examination -- as you know, we are dealing with
7  situations arising out of your tenure as an
8  arbitrator in a particular proceeding; is that
9  correct?
10      A.  Yes.
11      Q.  Were you, in fact, an arbitrator in a
12  proceeding regarding my client Anchorage Sand and
13  Gravel, Inc., and Laborers Local 341?
14      A.  Yes, I was.
15      Q.  And did you render a decision in that
16  matter?
17      A.  Yes, I did.
18      Q.  Now, have you been provided with any
19  documents related to pleadings in the lawsuit in
20  this matter?
21      A.  Yes.  I got an e-mail from you with a
22  set of documents.
23      Q.  Do you understand that Local 341 is
24  challenging and seeking to vacate the arbitrational
25  order that you entered?

---

**Page 7**

1      A.  Yes.  That was the first that I learned
2  of it.
3      Q.  Is it your understanding that they are
4  seeking to challenge it on the basis of an alleged
5  non-disclosure by you of certain information?
6      A.  Yes.
7      Q.  Now, Mr. Milne, I don't think, and
8  Counsel for the Union can certainly interject, I
9  don't think anybody is actually challenging the
10  actual -- any kind of actual allegation of bias in
11  your award.  Can you distinguish between an actual
12  claim of bias as opposed to simply a non-disclosure
13  issue; is that a meaningful distinction to you?
14      A.  Yes.
15      Q.  My questions are going to go to this
16  non-disclosure issue.  I'm not going to talk about
17  bias.  So if my questions seem to go to bias, let
18  me know because my questions are going to be on the
19  non-disclosure side of things.  Mr. Milne, how long
20  have you served as an arbitrator?
21      A.  Approximately, 20 years.  My first
22  arbitration was in 1986.
23      Q.  Do you have any recollection of any of
24  your decisions being vacated by order of the court?
25      A.  No.  Absolutely not.

---

**Page 8**

1      Q.  Have you ever had one of your orders
2  challenged on the basis of non-disclosure of any
3  item?
4      A.  No.
5      Q.  So nobody has even made that challenge
6  much less having a decision of yours vacated?
7      A.  Correct.  No one has made that
8  challenge.
9      Q.  Do have a recollection of how the
10  parties approached you in regard to this particular
11  arbitration?
12      A.  I believe it was a phone call at home
13  and I responded in that way.
14          (Exhibit 1 marked for identification. )
15  BY MR. JOHNSON:
16      Q.  Mr. Milne, I have handed you Exhibit 1.
17  Does that letter look familiar to you?
18      A.  Yes.
19      Q.  Are you going to get your glasses?
20      A.  Yes.
21      Q.  And does the letter describe the issue
22  between Anchorage Sand and Gravel, Inc., and
23  Laborers Union International Local 341?
24      A.  Yes, it does.
25      Q.  And is this letter signed by me as

---

**Page 9**

1  counsel for Anchorage Sand and Gravel and Mr.
2  Dougherty, general counsel for Alaska State
3  District Council of Laborers?
4      A.  Yes, I see it is.
5      Q.  And when you received this letter, did
6  you provide any information concerning your
7  availability and dates for a potential hearing as
8  well as a schedule for your fees?
9      A.  Yes, I did.
10      Q.  Had you ever had any relationship
11  whatsoever with Laborers Local 341?
12      A.  Only in working in construction.  And by
13  that I mean as a superintendent, at times, I would
14  hire through the union.
15      Q.  When you are referring to the union are
16  you talking specifically Laborers Union Local 341
17  or some other local?
18      A.  It was the Laborers Union with a local
19  -- I did work here in Anchorage too, so I imagine
20  I dealt with 341 here.
21      Q.  Do you know if there is a different
22  local in Fairbanks?
23      A.  I honestly don't know, clearly.
24          (Exhibit 2 marked for identification.)
25  BY MR. JOHNSON:

---

3 (Pages 6 to 9)

Alaska Stenotype Reporters

Exhibit A, p.3

Clark Milne                                    Deposition                                    January 31, 2006

**Page 10**

1       Q.  Mr. Milne, I'll represent to you this
2   was sent to you early on as a description of what
3   your mandates might be in this case.  Does this
4   look familiar at all?
5       A.  Yes, it is.
6       Q.  What does this appear to be?  The cover
7   sheet appears to be what?
8       A.  The collective bargaining agreement, the
9   plant agreement as it says there between the union
10  and the owner or the employer.
11      Q.  And the second page, is that an article
12  having to do with settlement of disputes?
13      A.  Yes, Article 15.
14      Q.  Is it fair to say this article calls for
15  a three-person panel with the employer selecting
16  one member and the union selecting one member and
17  the two selecting a third?
18      A.  Yes.
19      Q.  Was it your understanding that the
20  parties agreed to do it in a different fashion than
21  what was provided in this situation?
22      A.  Yes.  It was told, or written, I don't
23  remember, but it was agreed by both parties that
24  they were going to use a single arbitrator.
25      Q.  Is there anything in Article 15 that is

**Page 11**

1   in front you that refers to a specific source of
2   jurisdictional rules that you were to apply?  For
3   example, AAA or the National Association of
4   Securities Dealers or some other standard?
5       A.  No, I don't see any reference like that.
6       Q.  Ultimately, did you in fact serve as
7   arbitrator?
8       A.  Yes, I did.
9       Q.  Do you remember what the dates were that
10  you served as an arbitrator?
11      A.  I don't remember when the hearing was.
12  But I brought a copy of the decision, so I know it
13  was wrapped up when the decision was posted on July
14  5, 2005.
15      Q.  Okay.  Now the arbitration, when it took
16  place, occurred down here in Anchorage; is that
17  correct?
18      A.  Yes, it did.
19          (Exhibit 3 marked for identification.)
20  BY MR. JOHNSON:
21      Q.  What is that document, if can you tell
22  me?
23      A.  It says Affidavit of Michael Gallagher.
24      Q.  And if I could draw your attention to
25  paragraphs four and five on page 2?

**Page 12**

1       A.  Yes.
2       Q.  And you see there is a reference to the
3   date when the arbitration took place?
4       A.  Yes.  I see it mentions June 29, 2005.
5       Q.  Is that consistent with your
6   recollection?
7       A.  I don't remember the date, so it's not
8   inconsistent.
9       Q.  All right.  Mr. Milne, do you have a son
10  named Abraham Milne?
11      A.  Yes, I do.
12      Q.  And how old is your son?
13      A.  Just a second, 21.
14      Q.  Okay.  And does Abraham, do you mind if
15  I call him Abraham?
16      A.  No, that's fine.
17      Q.  Does Abraham live in your place of
18  residence?
19      A.  Yes, he does.
20      Q.  Has he been living in your place of
21  residence for the last two or three years?
22      A.  Since he returned from school, yes.
23      Q.  When did he return from school?
24      A.  He return from school in June, 2004.
25      Q.  What school did he return from?

**Page 13**

1       A.  He went to a AvTeck which is a
2   vocational technical school down in Seward.
3       Q.  Okay.  Has Abraham applied for various
4   jobs around the state?
5       A.  Yes, he has.
6       Q.  Has he applied for jobs in Fairbanks?
7       A.  Yes, he has.
8       Q.  Do you have any knowledge of his having
9   applied to participate in the Laborers
10  apprenticeship program?
11      A.  Yes.
12      Q.  Did he apply for that more than once?
13      A.  He has applied three times.
14      Q.  What dates were those, if you recall?
15      A.  I don't recall.
16      Q.  Do you understand anything about the
17  process of applying with the apprentice program?
18  Do you know what it consists of?
19      A.  I know a little bit about the process
20  from what he told me.
21      Q.  What did he tell you?
22      A.  He told me he had been aware -- we had
23  encouraged him to approach unions.  And he
24  approached the Laborers and the Carpenters and got
25  some paperwork; got an appointment for an interview

Alaska Stenotype Reporters

Clark Milne                     Deposition                     January 31, 2006

Page 14

1  and, I believe, in the instance of the Laborers, he
2  took a test, a written test.
3      Q.  Was he successful in the test or the
4  interview process with the apprentice program?
5      A.  No, he wasn't.
6      Q.  What was his goal with respect to taking
7  these tests or undertaking these interviews with
8  the apprentice program?
9      A.  He was hoping to enter the Laborers
10  apprenticeship program.
11      Q.  That was in Fairbanks?
12      A.  Yes.  And to clarify too, as I
13  mentioned, he applied to both the Laborers and
14  Carpenters.  That is why I said three times.
15      Q.  And was he successful in the process
16  with the Carpenters as well as the Laborers?
17      A.  No, he wasn't.
18      Q.  What was your understanding why he was
19  unsuccessful?
20      A.  My understanding is they had a lot of
21  applicants and he didn't make the cut.  He wasn't
22  among those they did select and entered that
23  apprenticeship program.
24      Q.  Was his goal to work with the
25  apprenticeship program and work in Fairbanks?

Page 15

1      A.  He would have worked anywhere they had
2  work, I imagine.  I'm sure he was at least hoping
3  the apprenticeship program would be in Fairbanks.
4      Q.  Was the apprenticeship program offered
5  in places other than Fairbanks, if you know?
6      A.  I don't know.
7      Q.  Do you remember having a reaction of any
8  kind when Abraham was telling you that he was
9  unsuccessful in his ventures with the Laborers
10  apprenticeship program?
11      A.  I don't remember any reaction in
12  particular.
13      Q.  Was Abraham disappointed?
14      A.  Yes, I think he was disappointed.  He
15  had hoped to be able to get in.  I'll volunteer
16  that I don't think he was surprised because it's
17  very competitive.  He had mentioned there were a
18  number of people.  He was fairly upbeat and I think
19  it's worth volunteering that indeed that's why he
20  ended up applying the second time and again was not
21  successful.
22      Q.  Was his lack of success in both of those
23  instances -- was it a moment of particular import
24  to you?
25      A.  No.

Page 16

1      Q.  How did he go about even describing to
2  you that he was unsuccessful?  Was it over dinner
3  or how did that come about?
4      A.  I am trying to remember if he got a
5  letter first or if he got a call.  I'm pretty sure
6  he just got a letter and it was kind of an oh,
7  shucks it didn't work out, the Laborers didn't end
8  up accepting me.
9      Q.  It was your understanding there were a
10  lot of applicants for those positions both with
11  respect to both the first time and the second time
12  he applied with the Laborers apprenticeship
13  program?
14      A.  Yes, it's been my impression since the
15  time I was in construction, working and hiring
16  people, that there was quite a bit of competition.
17  There is a lot work, there is lot of applicants.
18  Abe had friends that applied and had entered and
19  had gone into various trades.
20      Q.  Was there anything about Abraham's lack
21  of success in getting into the Laborers
22  apprenticeship program that led to any protests or
23  appeals of the decisions relating to his not being
24  successful?
25      A.  No, not at all.

Page 17

1      Q.  Did you do anything in particular on his
2  behalf following his statement to you that he was
3  unsuccessful in applying?
4      A.  No.
5      Q.  Did you have any feelings of animosity
6  toward the Laborers Union, generally, or Laborers
7  apprenticeship program as a consequence of
8  Abraham's failure to get into those programs?
9      A.  No, absolutely not.
10      Q.  What about with respect to the
11  Carpenters Union?
12      A.  No.
13      Q.  Now --
14      (Exhibit 4 marked for identification.)
15  BY MR. JOHNSON:
16      Q.  Mr. Milne, I have you handed you Exhibit
17  4.  The reference is made by a training director
18  that in June of '04 and May of '05, Abraham Milne
19  was interviewed and that he was not selected and
20  may apply if he so chooses.  Is that what this
21  document provides?
22      A.  Yes.
23      Q.  Is there anything about those dates that
24  suggest they're in error or is there any reason to
25  believe they are not correct?

5 (Pages 14 to 17)

Alaska Stenotype Reporters

Exhibit A, p.5