Page 18

1  A. I'm confident these are valid dates.
2  Q. Now the second one, though, May 4 of
3  '05, drawing your attention back to the first
4  document that I provided to you which is an inquiry
5  letter of June 6, 2005, was there a May 4, or at
6  least I should say the second time when Abraham was
7  unsuccessful in applying for the apprenticeship
8  program, was that issue on your mind at all when
9  you received the letter of June 6, 2005 asking
10 about your availability?
11 A. No, it wasn't.
12 Q. Did you have a discussion with a
13 gentleman by the name of Tim Sharp regarding the
14 apprenticeship program and your son?
15 A. Yes, I did.
16 Q. Did you have that discussion about May
17 of 2004?
18 A. I --
19 Q. Excuse me, strike that. In about August
20 of 2004 -- can't read my own handwriting.
21 A. I would have guessed September or
22 October, but it was fall of 2004.
23 Q. And what discussion did you have with
24 Mr. Sharp about the apprenticeship program?
25 A. The context will help here. We were

Page 19

1  moving the Coal Bunkers, so it is easily ratified
2  exactly which date it was, and Abe and I were
3  pulling a fence post so we could bring this large
4  object through this gate.
5  Q. Why were you doing that? Was it
6  voluntary work?
7  A. Yeah, it was just a charitable,
8  volunteer sort of activity. And part of the stuff
9  we were going to do potentially would involve the
10 Laborers Union, too. And so Tim was going to bring
11 some tool or something and in particular himself
12 and gloves.
13     He arrived in a forklift or small loader
14 backhoe or something so we could pull that post
15 which was quite heavy and Abe and I were together
16 on this sunny weekend afternoon and I introduced
17 Abe. Tim knew me, but didn't know Abe. So I said,
18 Hi, this is Abe and I do fuzzily remember saying
19 he's applied, you never know what will happen, good
20 labor candidate.
21 Q. This is Mr. Sharp saying that to you?
22 A. No, I said that to him. I was
23 introducing Abe because I wasn't sure he would
24 necessarily know who he was.
25 Q. And what did Mr. Sharp say?

Page 20

1  A. Oh, Hi -- or I don't remember, so I
2  will just stop there. I don't remember what he
3  said. I remember the conversation that that was a
4  topic kind of in a jocular sense, and we went back
5  to work. He was as little late and kind of
6  apologetic and set the stage and we got on with
7  what we were there for.
8  Q. Do you know other members of the
9  Laborers Union besides Tim Sharp up in Fairbanks?
10 A. Yes. I'm not sure I could come up with
11 any names. I have to differentiate. I know people
12 at several unions, but I can't come up with any
13 names. But yes, if there were four or five
14 different people working for the Laborers Union, I
15 would probably know them and be able to pick them
16 out of a photo.
17 Q. Have you done any work as an arbitrator
18 for any Laborers Union in Fairbanks?
19 A. No.
20 Q. With respect to any persons affiliated,
21 as you knew it, with a Laborers Union in Fairbanks,
22 did you ever complain about Abraham's failure to be
23 admitted to the apprenticeship program?
24 A. No. And let me extend that to say I
25 wasn't complaining on that day that I had that

Page 21

1  brief conversation with Mr. Sharp either. Like I
2  said, it was more of an introduction and stage
3  setting. But no, I hadn't complained to anyone
4  about his not getting into the Laborers Union.
5      MR. JOHNSON: I don't have any further
6  questions, Mr. Milne. Thank you.
7              EXAMINATION
8  BY MS. DRYGAS:
9  Q. Mr. Milne, I'm Heidi Drygas. I'm
10 general counsel for Laborers Local 341. I don't
11 want to cover any ground we have covered, so I'll
12 try to pare down my questions. What do you do full
13 time in addition to being an arbitrator?
14 A. Right. My normal full time job is I
15 work at the Department of Transportation in Public
16 Facilities in Fairbanks for the Northern Region as
17 Northern Region maintenance engineer.
18 Q. How long have you worked in that
19 position or with the State actually?
20 A. Two years in that position having worked
21 about a decade ago for four years as the
22 maintenance director.
23 Q. So a lot of the questions have been
24 answered, but were you aware your son applied for
25 the Laborers Apprenticeship Program in June 2004?

Page 22

1   A. Yes.
2   Q. Did you encourage him to apply?
3   A. Yes, I did.
4   Q. And I just want to make sure that we are
5   clear that Abe did, in fact, live with you at the
6   time he applied for the apprenticeship program in
7   June of '04?
8   A. Yes, he did.
9   Q. I want to revisit the conversation you
10  had with Tim Sharp in Fairbanks. First, let me
11  give you this so we can clarify the date. This
12  doesn't need to be an exhibit. This is a copy off
13  the web of the Fairbanks Coal Bunkers Project.
14  A. Okay.
15  Q. And I just want to show you that
16  paragraph and it also gives the date of what day
17  that work was completed. Can you verify that the
18  work was completed on August 17, 2004?
19  A. Yes. This refreshes my memory nicely.
20  The guy who maintains this website is Randy Griffen
21  and therefore I'm confident this is right. I just
22  thought it was later in the fall, it was kind of
23  chilly, and, yes. Yes.
24  Q. Okay. Thank you. Now, when you had
25  this conversation with Tim, you said you couldn't

Page 23

1   remember specifically what conversation took place?
2   A. Yes.
3   Q. Can you we mark this as an exhibit.
4   (Exhibit 5 marked for identification.)
5   BY MS. DRYGAS:
6   Q. If you could look at paragraph six and
7   seven of this affidavit and just briefly review
8   those.
9   A. Okay. I have read it.
10  Q. Would you have any reason to believe
11  that these are not accurate statements by Mr.
12  Sharp?
13  A. No, no reason to believe they were
14  inaccurate.
15  Q. So to the best of your knowledge, would
16  you say these are accurate statements of what
17  conversation probably took place at that time
18  realizing that your memory is a little hazy; it was
19  a year and half ago?
20  A. The two important features in here that
21  I think are probably true, I don't remember, but
22  I'm willing to believe his memory, is that he
23  voiced at that time that Abe could reapply. And
24  then shifting on to seven, there is no question, I
25  did know he had applied and failed to be selected.

Page 24

1   Q. Okay. Thank you. Is it true that Mr.
2   Sharp at that time, if you recall, encouraged your
3   son to reapply for the program?
4   A. I don't remember that.
5   Q. When this conversation with Mr. Sharp
6   took place was Abe there? Was he there for that
7   conversation?
8   A. Yes.
9   Q. Was he involved in participating in that
10  conversation?
11  A. Yes. My memory is that Tim had arrived.
12  He was a little abashed because he was fairly late,
13  jumped out of the rig he was driving which was this
14  backhoe and said something, Gee, I'm here, finally.
15  I said Hi, no problem; we were waiting for you to
16  start; by the way this is Abe.
17     I introduced him immediately so he would
18  know who this guy was. And immediately I said, I
19  don't know if you remember him, he had applied.
20  And he said -- I don't remember if he, Tim,
21  remembered him -- I don't remember that part and
22  then he said, Oh. And then we just moved on and
23  began on strapping on the posts. I don't remember
24  the part, but it is quite plausible that he said
25  just apply again or something.

Page 25

1   Q. And you said you were aware that your
2   son reapplied in May 2005?
3   A. Yes, I was.
4   Q. And you encouraged him to apply the
5   second time?
6   A. Yes.
7   Q. Did Abe live you with in May of 2005?
8   A. Yes.
9   Q. All right. Now, I want to go back to
10  the Pope arbitration. You accepted your
11  appointment as arbitrator in June of 2005?
12  A. Yes, I did.
13  Q. And that was just a month after your son
14  had been rejected for the apprenticeship program
15  the second time?
16  A. It doesn't say he was rejected in May;
17  it says he applied in May. I don't know when he
18  was rejected.
19  Q. Let me rephrase that then. He had
20  applied in May of 2005, and wasn't selected for
21  that particular role?
22  A. Yeah. It mentions in Exhibit 4 that he
23  interviewed May 4. I don't remember when. I'm
24  convinced that whenever the day he got letter or
25  call, and I think he got a letter, that I heard

Page 26

1   about it promptly. I don't remember if it was
2   before or after June -- Exhibit 1 -- June 6.
3   Because this was -- I did receive Exhibit 1 and I
4   think this was an e-mail attachment. So you may
5   want to re ask your question to get a clear answer.
6       Q. To the best of your knowledge, you
7   believe your son received his rejection letter from
8   the Laborers apprentice program prior to your
9   receiving this letter on June 6?
10      A. Understood. And I don't remember if was
11  before or after.
12          (Exhibit 6 marked for identification.)
13  BY MS. DRYGAS:
14      Q. I want to draw your attention to the
15  last paragraph at the bottom. Are you familiar
16  with this e-mail?
17      A. Yes. This is my response e-mail early
18  on as we were still communicating by e-mail;
19  globally so both parties were aware of the
20  exchange.
21      Q. And could you read the last paragraph of
22  that first page. That paragraph that starts with
23  "I am pleased."
24      A. It's says: "I am please to say that I
25  foresee and infer no conflicts of interest at this

Page 27

1   time that would in any way cause me to be unable to
2   properly and neutrally handle the arbitration of
3   this dispute. I do not have, and have never had,
4   any fiscal interest in or direct involvement with
5   the Laborers Union Local 341, AS&G, these
6   organizations' employees, or to my knowledge and
7   particularly the aggrieved individual mentioned in
8   your letter, Mr. Steve Pope. Please note my time
9   in the late 1970's and early 1980's working with
10  PKS and Interstate, which was in Anchorage."
11      Q. And you composed this e-mail?
12      A. Yes, I did.
13      Q. Back to the Pope arbitration which
14  occurred in June 2005. Prior to the beginning of
15  that hearing, is it true you stated you had no
16  conflict with either party?
17      A. Yes, I believe so.
18      Q. Do you agree that you should have
19  disclosed that fact that Abe had twice been
20  rejected from the apprenticeship program?
21          MR. JOHNSON: Objection. Calls for
22  legal conclusion.
23          THE WITNESS: Please state the question
24  again.
25  BY MS. DRYGAS:

Page 28

1       Q. Do you agree that you should have
2   disclosed the fact that Abe had twice been rejected
3   from the Laborers apprenticeship program prior to
4   accepting your nod as arbitrator?
5       A. If it had occurred to me, I would have
6   disclosed it. I will say that again in a slightly
7   different way. The reason I didn't disclose it was
8   I never thought of it. Up to the point of reading
9   the pleadings, it never occurred to me. Therefore,
10  I never chose not to disclose.
11          If -- let me go still farther. If it
12  occurred to me, if I had thought about the nexus,
13  or, Oh, Laborers-Abe, which I didn't, I think it
14  would have been proper to disclose. I even
15  extrapolate that I would have disclosed it, but,
16  unfortunately, it never occurred to me.
17          And the next direct step from that is,
18  it is my statement too, that, therefore, I didn't
19  participate in any bias or partiality or anything
20  because it never occurred to me. Up until the
21  pleadings, I never thought about Laborers and me
22  including that path.
23          You can tell I'm saying this multiple
24  times because it is in a way an answer to your
25  question. Unfortunately, I never got to your

Page 29

1   point. I think, technically, my answer to your
2   question is no. I couldn't disclose it if I never
3   thought of it.
4       Q. Okay.
5           (Exhibit 7 marked for identification.)
6   BY MS. DRYGAS:
7       Q. This is an e-mail you sent to the
8   gentlemen of both parties?
9       A. Yes.
10      Q. On Thursday the 19th of January, a
11  couple of weeks ago. I want to draw your attention
12  to the last paragraph you composed on that first
13  page. First, I want to clear up one thing: When
14  it says in the first and second lines of that
15  paragraph, starting with the second line: "I did
16  not think, feel or act with any impartially in my
17  arbitral service." Can you clarify what you
18  actually meant?
19      A. Yes. It looks silly now, but I think I
20  would rather strike the "i-m" in impartiality and
21  just as it seems obvious you understood what I
22  meant but it should have said, I did not think or
23  act with any partiality in my arbitral services.
24  Yes. Thank you for helping me to correct that.
25      Q. No problem. And now, to go to the

Page 30

1   next -- I think the third and fourth line I
2   underlined for you. In the third and fourth the
3   line of the e-mail, would you mind reading that
4   starting with: "Though I do now regret...
5       A.  Yes. I said there starting in the third
6   line: "Though I do now regret this oversight in
7   not thinking to mention Abe's failure to regard to
8   selection for the Laborers apprenticeship earlier
9   in 2005."
10      Q.  And you authored this e-mail to both
11  parties, correct?
12      A.  Yes, I did.
13      Q.  All right. You attended an arbitration
14  between the State and Laborers and the Public
15  Employees Local 71 on July 19, 2005; do you
16  remember that?
17      A.  Yes.
18      Q.  And this took place at the Department of
19  Transportation in Fairbanks?
20      A.  Yes.
21      Q.  Was it your decision to attend that
22  hearing?
23      A.  Yes, it was my decision.
24      Q.  D.O.T., this is your place of work?
25      A.  Yes.

Page 31

1       Q.  In Fairbanks. Is that where your office
2   is located, in that building?
3       A.  Yes. And as you know, because you were
4   there, I was there in the room at that arbitration
5   for approximately 15 minutes.
6       Q.  Yes. And what was your purpose in
7   attending that hearing?
8       A.  I was hoping to stay through the hearing
9   to aid the D.O.T. in terms of evaluation and
10  hearing the points being raised in the arbitration.
11      Q.  Were you aware that the State was
12  opposing a Laborers local at that time?
13      A.  It was -- yes.
14      Q.  Did you end up staying for the hearing?
15      A.  No. There had been a miscommunication
16  between one of witnesses and the A.G., the
17  Assistant A.G. that was working with the case. He
18  was not aware that I was coming and ended up
19  wondering why. And after a discussion with the
20  arbitrator, who was uncomfortable wondering what
21  was going on, I offered and we agreed I would just
22  exit.
23      Q.  Okay. As an arbitrator, do you abide by
24  the rules of ethics whether it's the AAA or the
25  Revised Uniform Arbitration Act, do you abide those

Page 32

1   rules regardless of whether they are spelled out by
2   the parties prior to an arbitration hearing?
3       A.  Yes, I do.
4       Q.  Let's go back. I didn't make a lot of
5   headway on that.
6       A.  Exhibit 7, is that what you're saying?
7       Q.  No. But do you think I need to ask more
8   questions?
9       A.  Yes, namely --
10          MR. JOHNSON: I'm going to object. She
11  needs to frame the question.
12  BY MS. DRYGAS:
13      Q.  I'm just going to ask you to go back to
14  when your son Abraham had applied for the Laborers
15  apprenticeship program in May of 2005. Would it be
16  accurate to state that he had received his
17  rejection letter from the Laborers prior to the
18  beginning of the arbitration hearing between Steve
19  Pope and AS&G which occurred on June 21, 2005?
20      A.  Understood, but I don't remember.
21          MS. DRYGAS: Okay. I think we are done.
22  Thank you.
23          MR. JOHNSON: I have a few follow ups.
24              EXAMINATION
25  BY MR. JOHNSON:

Page 33

1       Q.  Mr. Milne, I read your statements about
2   you regret certain oversights as you describe it
3   and so on. You don't know what the end result of
4   what a court would determine as whether or not you
5   really had to disclose this information, do you?
6       A.  No, I don't.
7       Q.  Is it fair to say that your regret runs
8   to the inconvenience it's causing the parties?
9       A.  That is correct. That's one of my
10  strong reasons to come and offer a deposition even
11  though I understand it is not always required. In
12  fact, it's seldom required. I think the parities
13  deserve the facts and by not thinking of it and not
14  disclosing and not walking that walk, I have
15  definitely inconvenienced the parties, which I
16  definitely regret.
17      Q.  So the inconvenience of the parties is
18  through the legal process that we a going through
19  to determine whether or not you had a
20  non-disclosure problem here; isn't that what it's
21  all about?
22      A.  Yes. I don't know all the legal
23  principles to be able to adequately gauge what the
24  court will decide on the matter of non-disclosure.
25      Q.  So let's say that the court were to

9 (Pages 30 to 33)

Page 34

1  conclude that what the Union suggests you should
2  have disclosed is really so attenuated you didn't
3  need to do that -- let's just assume that. That
4  fact is even proving that is still an inconvenience
5  to parties; isn't that right?
6      A. Yes.
7      Q. And you're regretful of causing that
8  inconvenience whatever the outcome is that
9  eventuates?
10     A. I am regretful of causing inconvenience
11 to the parties like this.
12     Q. The issue of Abraham's lack of success
13 in getting into the apprenticeship program was
14 something that didn't -- you don't even recall when
15 he got the notice the second time around in 2005?
16     A. Right. I know he has been working
17 throughout, since before that circumstance, and it
18 was just another alternative. I honestly I don't
19 know when he got either of the two rejections. I'm
20 confident the interviews are right in terms of the
21 training lady.
22     Q. You don't know do you what relationship,
23 if any, exists between the apprenticeship program
24 of Laborers and a particular local of the Laborers,
25 do you?

Page 35

1      A. I don't. I don't follow that.
2      Q. Do you think there is any relationship
3  between the apprenticeship program and the local
4  that might exist in Kentucky?
5      A. I don't know. I know our unions need
6  capable Alaskan workers so I assume there is a
7  connection between them, but I don't honestly know.
8      Q. Do you understand that there are a
9  number of locals affiliated with the Laborers
10 Union?
11     A. Yes. Hundreds, all over the country,
12 yes.
13     Q. And is it your understanding that there
14 is a local in Fairbanks, a separate local from the
15 Local 341 in Anchorage?
16     A. Yes. That was my remembrance, my
17 impression. I know the Carpenters have it split by
18 parallel and I can't remember if the Laborers are a
19 split local or not. I don't know.
20     Q. Now drawing your attention back to
21 Exhibit 6, that long paragraph, the last full
22 paragraph and there is a parenthetical where you
23 talk about certain work you did in Anchorage; is
24 that correct?
25     A. Yes.

Page 36

1      Q. Now, why would you bother to mention
2  anything about Anchorage?
3      A. I mentioned here and as was mentioned
4  earlier as we started the arbitration I mentioned
5  again I had worked and worked with the Laborers
6  Union and other unions in doing work for Peter
7  Quate (ph) in Anchorage in the '70's and '80's. So
8  I was alluding to that in here that I had been
9  involved with the Laborers Union.
10     Q. So you saw a need, is it fair to say,
11 there is a reason to recognize some issues that
12 occurred in Anchorage as distinct as to maybe what
13 occurred in Fairbanks?
14     A. The --
15     Q. Let me rephrase that question. It was a
16 poorly phrased question. You're from Fairbanks and
17 you had disclosed that you were familiar with
18 Fairbanks issues; is that correct in this
19 arbitration process?
20     A. I'm from Fairbanks and I'm definitely
21 more familiar with Fairbanks than Anchorage, but I
22 had worked in Anchorage and therefore surely was
23 involved with the local that Mr. Pope was working
24 for because he was in Anchorage.
25     Q. Back in the '70's and early '80's?

Page 37

1      A. Yes.
2      Q. So your testimony, as I understood it,
3  is that you do not recall when you heard about
4  Abraham's lack of success with the apprenticeship
5  program in 2005?
6      A. Yes.
7      Q. And you did not know if you heard about
8  his lack of success prior to or after June 29? You
9  just don't have any recollection of it?
10     A. I don't remember. It's kind of
11 consistent with the other point that I don't have
12 it tagged in my mind because it never occurred to
13 me and I don't remember. I would believe either
14 way.
15        I don't remember -- it doesn't take two
16 months after the interview to find out, but I don't
17 know if it's one month and it happened or --
18 actually, anyway I don't remember.
19     Q. It wasn't material to your thought
20 process?
21     A. No. It clearly wasn't because I will
22 say again: I didn't choose. It never occurred
23 Laborers-wise, Abe/me and, Gee, it would be a good
24 idea to disclose that. It never came to mind.
25 That's what I regret.