Page 38

1  counsel Kevin Dougherty.
2      Q. And he represented the trust fund on
3  matter and that trust fund is paid into by both 942
4  and members of 942 and 341 and the employers?
5      A. Yes.
6      Q. Do you recall to your knowledge did Mr.
7  Dougherty contact Mr. Johnson, counsel for
8  Anchorage Sand and Gravel to let them know?
9      A. I believe Mr. Dougherty did. I
10 requested that he let Counsel on the other side
11 know.
12     Q. When you learned about the arbitrator
13 Clark Milne's son being rejected from the Laborers
14 Apprenticeship Program, did you confront AS&G,
15 Anchorage Sand and Gravel, with that information?
16     A. Yes, I did.
17     Q. Who at AS&G did you give that
18 information to?
19     A. I believe I talked to Mr. Dale Morman and
20 Mr. Steve Lovs, I think. I believe we had sit-down
21 meeting. I called them and talked to them on the
22 phone and, I believe, I asked for a meeting.
23 I told them I just became aware of an issue and I
24 wanted to sit down and discuss with, I believe, it
25 was Mr. Morman for sure Mr. Lovs may have been

Page 39

1  there.
2          We discussed the issue about when I
3  found out that the arbitrator's son had not been
4  picked, not once but twice, for the Laborers
5  apprenticeship and that the arbitrator did not
6  disclose his ties with the his family members
7  through Alaska Laborers apprenticeship program. I
8  was very concerned about him not mentioning a
9  conflict, which I believe is accurate.
10     Q. Mr. Morman and Mr. Lovs, what are
11 their positions with AS&G?
12     A. Their exact titles, I'm not sure.
13     Q. Best estimate?
14     A. Mr. Morman is head of anchorage Sand
15 and Gravel and Mr. Lovs is one of the
16 superintendents and general managers there.
17     Q. Okay. When you confronted them, how did
18 they respond to that information, Mr. Morman and Mr.
19 Lovs?
20     A. The conversation that we had, Mr.
21 Morman took it very serious. He said let me do some
22 research. He did. He got back to me a week
23 or two later, whatever that was, maybe three weeks
24 later, and indicated to me that he didn't think
25 that it was a conflict of interest and that he had

Page 40

1  no desire at this time to -- Mike's recommendation
2  was to just pick another arbitrator and
3  re-arbitrate it.
4          And like I said earlier, this is the
5  first time in our history. And even though we
6  don't do a lot of arbitrations, we have done our
7  fair share over the 30 years I have been involved.
8  This is first time this has ever happened that we
9  found out that there was, we believe, a conflict.
10     Q. And you said you have been with the
11 Local for how many years?
12     A. Almost 31 years.
13     Q. Okay. Mr. Gallagher, do you believe
14 that it was the arbitrator's duty and not your duty
15 or the Local's duty to discover or disclose this
16 type of information about Abraham Milne?
17     A. I believe it's the arbitrator's duty to
18 disclose any conflict just like he did that morning
19 at the outset of our arbitration. He indicated
20 that there was no conflicts between the parties and
21 he had no dealings with them and in, like, I'm
22 saying it -- he may not have recognized it.
23         I don't know that. But he may have
24 forget to mention it that morning, I don't know.
25 He seems like a very honest person. But when I

Page 41

1  found out that his son was not picked for the
2  apprenticeship, not once but twice -- I'm a parent
3  just like any other parent. I'm a very protective
4  person with my children, and I believe most people
5  are.
6      Q. Let me think how to phrase this. It is
7  your opinion that the onus was not upon you to
8  research whether the arbitrator had a son, whether
9  he had applied as one of the many applicants of
10 apprenticeship program? Do you believe -- is it
11 your opinion that that onus was not upon you to
12 discover that type of information?
13     A. I believe, if I would have been the
14 arbitrator, I would have disclosed if my son had a
15 relationship with one of the parties.
16     Q. Do you believe it was your duty to
17 discover that information?
18     A. No, I don't. I believe that it was the
19 arbitrator's duty to disclose the conflict. And
20 then it was up to the two parties to decide whether
21 or not they felt it was a conflict.
22     Q. If you had been aware of the fact that
23 arbitrator's son, Abraham, had been rejected from
24 the Laborers apprenticeship program, would you have
25 agreed to the selection of Clark Milne as your

Michael Gallagher                           Deposition                           January 31, 2006

Page 42

```
 1  arbitrator?
 2      A.  No, I would not have.
 3          MS. DRYGAS:  That's all I have.
 4              EXAMINATION
 5  BY MR. JOHNSON:
 6      Q.  Just a follow up.  Mr. Gallagher, you
 7  indicated you had a sit-down conversation with at
 8  least Dale Morman or Steve Lovs.  Did either or
 9  both of those folks ask you a series of questions
10  to provide them further information by way of
11  verifying what you were suggesting?  Do you
12  remember any kind of a list of questions either
13  being presented to you orally or in writing?
14      A.  I believe, there was something, yes.  I
15  don't know if it was orally or if he gave me the
16  questions written.  It could have been either one
17  of them.  I do remember getting back with him with
18  some of the information, yes.
19      Q.  Do you remember what information you
20  provided him at that time?
21      A.  I would have to research it.  I have a
22  file at my office, I could tell you what I told him
23  or what I sent him.
24      Q.  Do you have a recollection of providing
25  him some written information?
```

12 (Page 42)

```
 1       A.   I believe, I did.  I believe it was --
 2   it may have been -- I would have to research my
 3   records so don't hold me to this, but I believe it
 4   was information from our training director, Mr.
 5   Louinger, stating that his son, the arbitrator's
 6   son, had applied in 2004-2005 for the
 7   apprenticeship program.
 8           MR. JOHNSON:  Thank you.  That's all my
 9   questions.
10           (Proceedings concluded at 4:15 p.m.)
```

Page 43