IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF ALASKA AT ANCHORAGE

LABORERS LOCAL 341,

        Plaintiff,

vs.

ANCHORAGE SAND AND GRAVEL
COMPANY, INC.,

        Defendant.
_____/
Case No. A05-250 CV (JWS)

DEPOSITION OF CLARK MILNE

Pages 1-40, inclusive

Commencing at 2:05 p.m.

Tuesday, January 31, 2006

Anchorage, Alaska

Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage, Alaska 99501-3520
Serving Alaska Since 1953

Rick D. McWilliams, RPR, Ret.    Telephone (907)276-1680
Fred M. Getty, RPR, Ret.       E-mail AkSteno@acsalaska.net
                                Fax (907) 276-8016

Page 2

1  IN THE UNITED STATES DISTRICT COURT FOR
2  THE DISTRICT OF ALASKA AT ANCHORAGE
3
4  LABORERS LOCAL 341,
5      Plaintiff,
6  vs.
7
8  ANCHORAGE SAND AND GRAVEL COMPANY, INC.,
9      Defendant.
    _____/
10  Case No. A05-250 CV (JWS)
11
12
13      DEPOSITION OF CLARK MILNE,
14  taken on behalf of the defendant, pursuant to notice
15  at the offices of Wohlforth, Johnson, Brecht, Cartledge
16  & Brooking, Anchorage, Alaska, before Patta K. Johnson,
17  Shorthand Reporter for Alaska Stenotype Reporters and
18  Notary Public in and for the State of Alaska.

Page 3

    APPEARANCES

For the Defendant:  WOHLFORTH, JOHNSON, BRECHT,
                    CARTLEDGE & BROOKING
                  By: Robert Johnson
                  900 West Fifth Avenue
                  Suite 600
                  Anchorage, Alaska 99501
                  907-276-6401

For the Plaintiff:  GENERAL COUNSEL ALASKA STATE
                    DISTRICT COUNCIL OF LABORERS
                  By: Heidi Drygas
                  2501 Commercial Drive
                  Suite 140
                  Anchorage, Alaska 99501

Also Present:     Kevin Dougherty, General Council
                  Alaska District Council of Laborers

Reported By: Patta K. Johnson

Page 4

        I N D E X

EXAMINATION BY:                  PAGE

Mr. Johnson                    5, 32
Ms. Drygas                     21

EXHIBITS:

Exhibit 1                    8
Exhibit 2                    9
Exhibit 3                    11
Exhibit 4                    12
Exhibit 5                    23
Exhibit 6                    26
Exhibit 7                    29

Page 5

1  Whereupon,
2        CLARK MILNE,
3  called as a witness herein having been duly sworn
4  upon oath by Patta K. Johnson, Notary Public, was
5  examined and testified as follows:
6        EXAMINATION
7  BY MR. JOHNSON:
8    Q. Mr. Clark, for the record, please state
9       your name and spell your last name?
10   A. My name is Clark Milne, C- l- a- r- k,
11      M- i- l- n- e.
12   Q. What is your address, Mr. Milne?
13   A. I live in Fairbanks, 1119 Coppet, C- o-
14      p- p- e- t, Street, Fairbanks 99709.
15   Q. Mr. Milne, have you been involved in a
16      deposition before?
17   A. Yes, but it has been a decade or so.
18   Q. Just as a refresher, I'm going to ask
19      you questions and, of course, I appreciate
20  your
21      best answers to them. You are under oath
22  and it is
23      anticipated your deposition could be used
24  at trial,
25      and, certainly, motion practice in this

Page 6

1  particular
2  case.
3       If I ask a question that makes no sense,
4  if you don't understand it or it's unclear, let me
5  know and I will try to rephrase it.  The
6  examination -- as you know, we are dealing with
7  situations arising out of your tenure as an
8  arbitrator in a particular proceeding; is that
9  correct?
10      A.  Yes.
11      Q.  Were you, in fact, an arbitrator in a
12 proceeding regarding my client Anchorage Sand and
13 Gravel, Inc., and Laborers Local 341?
14      A.  Yes, I was.
15      Q.  And did you render a decision in that
16 matter?
17      A.  Yes, I did.
18      Q.  Now, have you been provided with any
19 documents related to pleadings in the lawsuit in
20 this matter?
21      A.  Yes.  I got an e-mail from you with a
22 set of documents.
23      Q.  Do you understand that Local 341 is
24 challenging and seeking to vacate the arbitrational
25 order that you entered?

Page 7

1       A.  Yes.  That was the first that I learned
2  of it.
3       Q.  Is it your understanding that they are
4  seeking to challenge it on the basis of an alleged
5  non-disclosure by you of certain information?
6       A.  Yes.
7       Q.  Now, Mr. Milne, I don't think, and
8  Counsel for the Union can certainly interject, I
9  don't think anybody is actually challenging the
10 actual -- any kind of actual allegation of bias in
11 your award.  Can you distinguish between an actual
12 claim of bias as opposed to simply a non-disclosure
13 issue; is that a meaningful distinction to you?
14      A.  Yes.
15      Q.  My questions are going to go to this
16 non-disclosure issue.  I'm not going to talk about
17 bias.  So if my questions seem to go to bias, let
18 me know because my questions are going to be on the
19 non-disclosure side of things.  Mr. Milne, how long
20 have you served as an arbitrator?
21      A.  Approximately, 20 years.  My first
22 arbitration was in 1986.
23      Q.  Do you have any recollection of any of
24 your decisions being vacated by order of the court?
25      A.  No.  Absolutely not.

Page 8

1       Q.  Have you ever had one of your orders
2  challenged on the basis of non-disclosure of any
3  item?
4       A.  No.
5       Q.  So nobody has even made that challenge
6  much less having a decision of yours vacated?
7       A.  Correct.  No one has made that
8  challenge.
9       Q.  Do have a recollection of how the
10 parties approached you in regard to this particular
11 arbitration?
12      A.  I believe it was a phone call at home
13 and I responded in that way.
14          (Exhibit 1 marked for identification. )
15 BY MR. JOHNSON:
16      Q.  Mr. Milne, I have handed you Exhibit 1.
17 Does that letter look familiar to you?
18      A.  Yes.
19      Q.  Are you going to get your glasses?
20      A.  Yes.
21      Q.  And does the letter describe the issue
22 between Anchorage Sand and Gravel, Inc., and
23 Laborers Union International Local 341?
24      A.  Yes, it does.
25      Q.  And is this letter signed by me as

Page 9

1  counsel for Anchorage Sand and Gravel and Mr.
2  Dougherty, general counsel for Alaska State
3  District Council of Laborers?
4       A.  Yes, I see it is.
5       Q.  And when you received this letter, did
6  you provide any information concerning your
7  availability and dates for a potential hearing as
8  well as a schedule for your fees?
9       A.  Yes, I did.
10      Q.  Had you ever had any relationship
11 whatsoever with Laborers Local 341?
12      A.  Only in working in construction.  And by
13 that I mean as a superintendent, at times, I would
14 hire through the union.
15      Q.  When you are referring to the union are
16 you talking specifically Laborers Union Local 341
17 or some other local?
18      A.  It was the Laborers Union with a local
19 -- I did work here in Anchorage too, so I imagine
20 I dealt with 341 here.
21      Q.  Do you know if there is a different
22 local in Fairbanks?
23      A.  I honestly don't know, clearly.
24          (Exhibit 2 marked for identification.)
25 BY MR. JOHNSON:

Page 10

1    Q. Mr. Milne, I'll represent to you this
2 was sent to you early on as a description of what
3 your mandates might be in this case. Does this
4 look familiar at all?
5    A. Yes, it is.
6    Q. What does this appear to be? The cover
7 sheet appears to be what?
8    A. The collective bargaining agreement, the
9 plant agreement as it says there between the union
10 and the owner or the employer.
11    Q. And the second page, is that an article
12 having to do with settlement of disputes?
13    A. Yes, Article 15.
14    Q. Is it fair to say this article calls for
15 a three-person panel with the employer selecting
16 one member and the union selecting one member and
17 the two selecting a third?
18    A. Yes.
19    Q. Was it your understanding that the
20 parties agreed to do it in a different fashion than
21 what was provided in this situation?
22    A. Yes. It was told, or written, I don't
23 remember, but it was agreed by both parties that
24 they were going to use a single arbitrator.
25    Q. Is there anything in Article 15 that is

Page 11

1 in front you that refers to a specific source of
2 jurisdictional rules that you were to apply? For
3 example, AAA or the National Association of
4 Securities Dealers or some other standard?
5    A. No, I don't see any reference like that.
6    Q. Ultimately, did you in fact serve as
7 arbitrator?
8    A. Yes, I did.
9    Q. Do you remember what the dates were that
10 you served as an arbitrator?
11    A. I don't remember when the hearing was.
12 But I brought a copy of the decision, so I know it
13 was wrapped up when the decision was posted on July
14 5, 2005.
15    Q. Okay. Now the arbitration, when it took
16 place, occurred down here in Anchorage; is that
17 correct?
18    A. Yes, it did.
19    (Exhibit 3 marked for identification.)
20 BY MR. JOHNSON:
21    Q. What is that document, if can you tell
22 me?
23    A. It says Affidavit of Michael Gallagher.
24    Q. And if I could draw your attention to
25 paragraphs four and five on page 2?

Page 12

1    A. Yes.
2    Q. And you see there is a reference to the
3 date when the arbitration took place?
4    A. Yes. I see it mentions June 29, 2005.
5    Q. Is that consistent with your
6 recollection?
7    A. I don't remember the date, so it's not
8 inconsistent.
9    Q. All right. Mr. Milne, do you have a son
10 named Abraham Milne?
11    A. Yes, I do.
12    Q. And how old is your son?
13    A. Just a second, 21.
14    Q. Okay. And does Abraham, do you mind if
15 I call him Abraham?
16    A. No, that's fine.
17    Q. Does Abraham live in your place of
18 residence?
19    A. Yes, he does.
20    Q. Has he been living in your place of
21 residence for the last two or three years?
22    A. Since he returned from school, yes.
23    Q. When did he return from school?
24    A. He return from school in June, 2004.
25    Q. What school did he return from?

Page 13

1    A. He went to a AvTeck which is a
2 vocational technical school down in Seward.
3    Q. Okay. Has Abraham applied for various
4 jobs around the state?
5    A. Yes, he has.
6    Q. Has he applied for jobs in Fairbanks?
7    A. Yes, he has.
8    Q. Do you have any knowledge of his having
9 applied to participate in the Laborers
10 apprenticeship program?
11    A. Yes.
12    Q. Did he apply for that more than once?
13    A. He has applied three times.
14    Q. What dates were those, if you recall?
15    A. I don't recall.
16    Q. Do you understand anything about the
17 process of applying with the apprentice program?
18 Do you know what it consists of?
19    A. I know a little bit about the process
20 from what he told me.
21    Q. What did he tell you?
22    A. He told me he had been aware -- we had
23 encouraged him to approach unions. And he
24 approached the Laborers and the Carpenters and got
25 some paperwork; got an appointment for an interview

### Page 14

1  and, I believe, in the instance of the Laborers, he
2  took a test, a written test.
3      Q.  Was he successful in the test or the
4  interview process with the apprentice program?
5      A.  No, he wasn't.
6      Q.  What was his goal with respect to taking
7  these tests or undertaking these interviews with
8  the apprentice program?
9      A.  He was hoping to enter the Laborers
10 apprenticeship program.
11     Q.  That was in Fairbanks?
12     A.  Yes.  And to clarify too, as I
13 mentioned, he applied to both the Laborers and
14 Carpenters.  That is why I said three times.
15     Q.  And was he successful in the process
16 with the Carpenters as well as the Laborers?
17     A.  No, he wasn't.
18     Q.  What was your understanding why he was
19 unsuccessful?
20     A.  My understanding is they had a lot of
21 applicants and he didn't make the cut.  He wasn't
22 among those they did select and entered that
23 apprenticeship program.
24     Q.  Was his goal to work with the
25 apprenticeship program and work in Fairbanks?

### Page 15

1      A.  He would have worked anywhere they had
2  work, I imagine.  I'm sure he was at least hoping
3  the apprenticeship program would be in Fairbanks.
4      Q.  Was the apprenticeship program offered
5  in places other than Fairbanks, if you know?
6      A.  I don't know.
7      Q.  Do you remember having a reaction of any
8  kind when Abraham was telling you that he was
9  unsuccessful in his ventures with the Laborers
10 apprenticeship program?
11     A.  I don't remember any reaction in
12 particular.
13     Q.  Was Abraham disappointed?
14     A.  Yes, I think he was disappointed.  He
15 had hoped to be able to get in.  I'll volunteer
16 that I don't think he was surprised because it's
17 very competitive.  He had mentioned there were a
18 number of people.  He was fairly upbeat and I think
19 it's worth volunteering that indeed that's why he
20 ended up applying the second time and again was not
21 successful.
22     Q.  Was his lack of success in both of those
23 instances -- was it a moment of particular import
24 to you?
25     A.  No.

### Page 16

1      Q.  How did he go about even describing to
2  you that he was unsuccessful?  Was it over dinner
3  or how did that come about?
4      A.  I am trying to remember if he got a
5  letter first or if he got a call.  I'm pretty sure
6  he just got a letter and it was kind of an oh,
7  shucks it didn't work out, the Laborers didn't end
8  up accepting me.
9      Q.  It was your understanding there were a
10 lot of applicants for those positions both with
11 respect to both the first time and the second time
12 he applied with the Laborers apprenticeship
13 program?
14     A.  Yes, it's been my impression since the
15 time I was in construction, working and hiring
16 people, that there was quite a bit of competition.
17 There is a lot work, there is lot of applicants.
18 Abe had friends that applied and had entered and
19 had gone into various trades.
20     Q.  Was there anything about Abraham's lack
21 of success in getting into the Laborers
22 apprenticeship program that led to any protests or
23 appeals of the decisions relating to his not being
24 successful?
25     A.  No, not at all.

### Page 17

1      Q.  Did you do anything in particular on his
2  behalf following his statement to you that he was
3  unsuccessful in applying?
4      A.  No.
5      Q.  Did you have any feelings of animosity
6  toward the Laborers Union, generally, or Laborers
7  apprenticeship program as a consequence of
8  Abraham's failure to get into those programs?
9      A.  No, absolutely not.
10     Q.  What about with respect to the
11 Carpenters Union?
12     A.  No.
13     Q.  Now --
14         (Exhibit 4 marked for identification.)
15 BY MR. JOHNSON:
16     Q.  Mr. Milne, I have you handed you Exhibit
17 4.  The reference is made by a training director
18 that in June of '04 and May of '05, Abraham Milne
19 was interviewed and that he was not selected and
20 may apply if he so chooses.  Is that what this
21 document provides?
22     A.  Yes.
23     Q.  Is there anything about those dates that
24 suggest they're in error or is there any reason to
25 believe they are not correct?

Page 18

1  A. I'm confident these are valid dates.
2  Q. Now the second one, though, May 4 of
3  '05, drawing your attention back to the first
4  document that I provided to you which is an inquiry
5  letter of June 6, 2005, was there a May 4, or at
6  least I should say the second time when Abraham was
7  unsuccessful in applying for the apprenticeship
8  program, was that issue on your mind at all when
9  you received the letter of June 6, 2005 asking
10 about your availability?
11 A. No, it wasn't.
12 Q. Did you have a discussion with a
13 gentleman by the name of Tim Sharp regarding the
14 apprenticeship program and your son?
15 A. Yes, I did.
16 Q. Did you have that discussion about May
17 of 2004?
18 A. I --
19 Q. Excuse me, strike that. In about August
20 of 2004 -- can't read my own handwriting.
21 A. I would have guessed September or
22 October, but it was fall of 2004.
23 Q. And what discussion did you have with
24 Mr. Sharp about the apprenticeship program?
25 A. The context will help here. We were

Page 19

1  moving the Coal Bunkers, so it is easily ratified
2  exactly which date it was, and Abe and I were
3  pulling a fence post so we could bring this large
4  object through this gate.
5  Q. Why were you doing that? Was it
6  voluntary work?
7  A. Yeah, it was just a charitable,
8  volunteer sort of activity. And part of the stuff
9  we were going to do potentially would involve the
10 Laborers Union, too. And so Tim was going to bring
11 some tool or something and in particular himself
12 and gloves.
13     He arrived in a forklift or small loader
14 backhoe or something so we could pull that post
15 which was quite heavy and Abe and I were together
16 on this sunny weekend afternoon and I introduced
17 Abe. Tim knew me, but didn't know Abe. So I said,
18 Hi, this is Abe and I do fuzzily remember saying
19 he's applied, you never know what will happen, good
20 labor candidate.
21 Q. This is Mr. Sharp saying that to you?
22 A. No, I said that to him. I was
23 introducing Abe because I wasn't sure he would
24 necessarily know who he was.
25 Q. And what did Mr. Sharp say?

Page 20

1  A. Oh, Hi -- or I don't remember, so I
2  will just stop there. I don't remember what he
3  said. I remember the conversation that that was a
4  topic kind of in a jocular sense, and we went back
5  to work. He was as little late and kind of
6  apologetic and set the stage and we got on with
7  what we were there for.
8  Q. Do you know other members of the
9  Laborers Union besides Tim Sharp up in Fairbanks?
10 A. Yes. I'm not sure I could come up with
11 any names. I have to differentiate. I know people
12 at several unions, but I can't come up with any
13 names. But yes, if there were four or five
14 different people working for the Laborers Union, I
15 would probably know them and be able to pick them
16 out of a photo.
17 Q. Have you done any work as an arbitrator
18 for any Laborers Union in Fairbanks?
19 A. No.
20 Q. With respect to any persons affiliated,
21 as you knew it, with a Laborers Union in Fairbanks,
22 did you ever complain about Abraham's failure to be
23 admitted to the apprenticeship program?
24 A. No. And let me extend that to say I
25 wasn't complaining on that day that I had that

Page 21

1  brief conversation with Mr. Sharp either. Like I
2  said, it was more of an introduction and stage
3  setting. But no, I hadn't complained to anyone
4  about his not getting into the Laborers Union.
5      MR. JOHNSON: I don't have any further
6  questions, Mr. Milne. Thank you.
7          EXAMINATION
8  BY MS. DRYGAS:
9  Q. Mr. Milne, I'm Heidi Drygas. I'm
10 general counsel for Laborers Local 341. I don't
11 want to cover any ground we have covered, so I'll
12 try to pare down my questions. What do you do full
13 time in addition to being an arbitrator?
14 A. Right. My normal full time job is I
15 work at the Department of Transportation in Public
16 Facilities in Fairbanks for the Northern Region as
17 Northern Region maintenance engineer.
18 Q. How long have you worked in that
19 position or with the State actually?
20 A. Two years in that position having worked
21 about a decade ago for four years as the
22 maintenance director.
23 Q. So a lot of the questions have been
24 answered, but were you aware your son applied for
25 the Laborers Apprenticeship Program in June 2004?