Page 14

1  different aspects of the interview. After all the
2  interviews are completed, they are -- the scores
3  are tallied and you come up with a common score.
4  You divide them by three and come up with an
5  average score and that person is ranked at that
6  time.
7           There is a lot of misconception about
8  how an apprenticeship picks people that are going
9  to be put into the program. A lot of people think
10 it is the business manager, such as myself, or one
11 of the agents that determine who puts them in
12 there, but that is not how that works.
13     Q. So there is an interview process. Is
14 there then a test that is administered?
15     A. There are times that we will give a math
16 test just to see where a person places with math,
17 but other than that that is only the requirement.
18     Q. How do you tell somebody that they have
19 been either successful or unsuccessful in passing
20 through this process you have just described?
21     A. Hypothetically, if we interview a
22 hundred people and we take a look at work, what the
23 work situation is going to be and we say we decide
24 we are going to select 20 to 25 people, what we
25 would do is we would take the top 20, 25 scores and

Page 15

1  as work becomes available, we would start with the
2  person with highest score and just work our way
3  down.
4           Being in the construction industry, it's
5  real difficult to say we are going to take exactly
6  20 people or we are going to take exactly 50
7  people. It just depends on the type of work that
8  our contractors are dealing with and so it just
9  varies. We have had to open our apprenticeship up
10 several times, and we do that in a season.
11 Sometimes we open the apprenticeship up two times
12 and sometimes we have had to open it up three
13 times.
14     Q. I don't think I understand what you mean
15 by "open up" the apprenticeship program?
16     A. The program, under the federal
17 guidelines with the Bureau of Apprenticeship, we
18 have to -- when we applied for our standard for
19 our apprenticeship program, you have certain
20 openings that we tell the federal apprenticeship
21 group we are going to open our apprenticeship,
22 whether we are going open up in the winter or
23 spring or fall or go to a continuous opening to
24 give us the latitude. Sometimes we look into the
25 crystal ball and we misjudge the amount of

Page 16

1  construction work that is going to start. A
2  project we are not aware of can come up and we may
3  need more people than we anticipated. When that
4  happens, we will open our apprenticeship more than
5  one time in a year.
6      Q. So by opening it up it's an invitation
7  to folks that want to apply for it, is that what
8  you mean by opening?
9      A. Yes.
10     Q. It's an announcement, an invitation to
11 come and apply?
12     A. Yes. We have to do certain advertising
13 requirements to meet the guidelines that we are
14 reaching out and giving public notice, that we are
15 opening up our apprenticeship program.
16     Q. How many openings, as you describe it,
17 occurred at least for the apprenticeship program in
18 Fairbanks in 2004 and then in 2005?
19     A. In Fairbanks? I'm just guessing. I
20 can't even tell you how many times we did it in
21 Anchorage and I oversee a lot of that. I would say
22 probably four times.
23     Q. In each of those years?
24     A. Together. Probably two or three times a
25 year is what we have been averaging in the last

Page 17

1  three years.
2      Q. Now, young Mr. Milne applied and was
3  unsuccessful once in 2004 and 2005 again. Do you
4  recall that; is that your understanding?
5      A. That is my understanding, yes.
6      Q. Do you have any idea how many applicants
7  there were for those apprenticeship programs at the
8  openings where he applied and was unsuccessful?
9      A. No, I don't.
10     Q. Was it more than ten people?
11     A. I would think so, yes.
12     Q. Are we talking hundreds of people?
13     A. I would say, and this is just a guess,
14 but between Anchorage and Fairbanks we usually have
15 anywhere from 50 to 100 people, approximately, that
16 apply for each opening.
17     Q. And of that 100 to 150 that apply at
18 each opening, what is the typical acceptance ratio?
19 You described 20 to 30; is that about correct?
20     A. I would have to look. I used to be real
21 involved in all the interviews. The last couple
22 years I have not been involved in it. So I don't
23 know the exact number.
24     Q. Do have you an estimate?
25     A. Last year, I don't know totally. I can

Page 18

1  give you a ball park figure. Some of them are
2  first-year apprentices, some of them are second
3  year, some of them are third year, but we have
4  about 90 to 100 people in the program. And each
5  year we probably take in, and this is just a
6  guesstimate, probably 20 to 30, 40 people.
7       Q. So based on your experience, is it fair
8  to say it sounds like 30 percent of the applicants
9  are accepted into the program in recent times?
10      A. It really depends on the people that are
11 doing the interviews and it depends on the
12 workload. It depends on the quality of the
13 applicants that are coming in. There are several
14 variables that we look at as an organization of
15 what we want to bring in.
16      Q. Who would the person or what would be
17 the source that I would best go to to get that
18 information for 2004, 2005?
19      A. To get the exact numbers would be Les
20 Louinger. Les Louinger is the training director for
21 Alaska Laborers Training Fund and the
22 apprenticeship program.
23      Q. Now is Les Louinger, he is not an
24 employee of Local 341?
25      A. No, he is not.

Page 19

1       Q. He is an employee of that particular
2  program alone; is that correct?
3       A. He is an employee of the Laborers
4  training school and apprenticeship program. He is
5  a member of Laborers Local 341.
6       Q. When a person is accepted the into the
7  apprenticeship program after going through the
8  process that you've described, does that person
9  then go through classes, through a training period
10 or sent out to a job site?
11      A. When a person is selected, we like to
12 give them a couple of weeks minimum training. That
13 doesn't always happen, but that is what we try to
14 do. So rule of thumb they would get at least two
15 weeks of training and we would place them in a job
16 with a contractor and then every year they have
17 to -- I believe, the number they have is 144 hours
18 of additional training every year.
19      Q. Now, Mr. Gallagher, you attended the
20 arbitration that is at issue in this matter; did
21 you not?
22      A. Yes, I did.
23      Q. June 29, 2005, does that sound about
24 right?
25      A. It sounds about approximately, yes.

Page 20

1       Q. At that particular proceeding, did you
2  detect any animosity toward the Union from Mr.
3  Milne the arbitrator?
4       A. No, I didn't.
5       Q. At the time of the proceeding, did you
6  know at that time he had a son that applied to the
7  apprenticeship program?
8       A. No, I didn't.
9       Q. Why didn't you?
10      A. I didn't know.
11      Q. Well, isn't there a connection between
12 the apprenticeship program and Local 341?
13      A. Between Laborers Local 341 and Laborers
14 Local 942, between us we have about 3300 members
15 and I don't know all the apprentices that belong to
16 Laborers Local 341. I don't deal with every single
17 individual person. I would never have that much
18 time on my hands.
19      Q. In this proceeding you filed an
20 affidavit; do you recall doing that?
21      A. Yes, I do.
22      Q. In that you made this statement --
23         MS. DRYGAS: Which?
24         MR. JOHNSON: In the affidavit of
25 Michael Gallagher. I don't propose to introduce it

Page 21

1  necessarily but I can do if you like.
2  BY MR. JOHNSON:
3       Q. You make the statement: "On or about
4  July 11, 2005, I learned from Dan Simonian, the
5  president and business agent of Local 942 in
6  Fairbanks that the arbitrator's son Abraham Milne,
7  failed to be selected for enrollment by the Alaska
8  Laborers Training Trust Apprenticeship Program on
9  two separate occasions." Do you recall making that
10 statement in your affidavit?
11      A. Yes, I do.
12      Q. Was that a truthful statement?
13      A. Yes.
14      Q. Why did Dan Simonian mention to you that
15 the arbitrator's son, Abraham Milne, failed to be
16 selected?
17      A. I can't remember exact word-for-word,
18 but in essence, we were discussing an arbitration
19 that we had and I told him we lost the arbitration.
20      Q. When you were referring to the
21 arbitration, you're talking about the Steve Pope
22 arbitration that Mr. Milne --
23      A. Yes. And he asked me who the arbitrator
24 was and I told him and he says, Well, were you
25 aware his son has applied twice for the Laborers

Page 22

1  apprenticeship program and I said, no. And he
2  hasn't been selected either time.
3         And when the morning of our arbitration
4  with Mr. Pope, the arbitrator -- one of the first
5  things he said was that he had no conflicts; didn't
6  know the laborers, didn't know Anchorage Sand,
7  didn't know any of the parties. And I recall when
8  Kevin Dougherty from my general counsel -- I was on
9  vacation when he got the arbitrator's ruling. Mr.
10 Dougherty told me that we lost of arbitration they
11 ruled if favor the Anchorage Sand and Gravel. And
12 I said, Kevin, do me a favor call Steve Pope and
13 let him know and let him know that it was over.
14        This is the first time in our history we
15 have ever challenged an arbitrator. We believe in
16 the process very strongly but when we found out
17 that the arbitrator's son had not been selected two
18 times from the Laborers apprenticeship program I
19 felt there was a conflict of interest.
20        I'm a parent just like anybody else.
21 We, as parents, are very protective of our kids and
22 I believe that -- I believe he should have told us
23 about that potential conflict and I believe it is a
24 conflict.
25     Q.  Let's say the arbitrator's decision

Page 23

1  would have gone the opposite direction held in
2  favor of the Union and favor of Mr. Pope and this
3  information came to your attention, what would you
4  have done?
5     A.  I don't know. But it was like when we
6  were picking an arbitrator, during that process my
7  attorney Mr. Dougherty I asked him to go through a
8  process for me and I believe we had it down to two
9  arbitrators and Kevin Dougherty told me, my
10 counsel, who the names were. And I do know I
11 implied to him right away one the arbitrators, I
12 can't even think of his name right now, but I told
13 him that that arbitrator has done work for us and I
14 said make sure that the other party is aware that
15 he has worked for us.
16    Q.  But you're not referring to Mr. Milne
17 are you?
18    A.  No. I think it was Mr. Bledsoe or
19 something like that.
20    Q.  Did you direct your counsel or yourself
21 to undertake an inquiry of Local 942 or the
22 apprenticeship program or did you undertake any
23 inquiry of them as to whether they had any
24 knowledge about Mr. Milne?
25    A.  Could you repeat that, please.

Page 24

1     Q.  When you heard that Mr. Milne and Mr.
2  Bledsoe were being considered as arbitrators, did
3  you run their names by officials of Local 942?
4     A.  No, I didn't.
5     Q.  Did you run their names by
6  representatives of the apprenticeship program?
7     A.  No, I didn't.
8     Q.  Did you run them by the officials of
9  Local 71?
10    A.  I did not, no.
11    Q.  Did you direct anybody to run those
12 names by any of Local 71 or 942 or the
13 apprenticeship program?
14    A.  I never directed my counsel, but I do
15 believe my counsel talked to somebody from Local
16 71.
17    Q.  But your understanding is nobody talked
18 to anybody from 942 or from the apprenticeship
19 program?
20    A.  Well, let me take that back. Our
21 apprenticeship director -- I believe I had
22 conversations with him about this arbitration. So
23 let me restate what I said.
24    Q.  You had conversations with him prior
25 about who the arbitrator was?

Page 25

1     A.  We had discussions, but exactly what we
2  discussed, I'm not sure. I know I had discussions
3  with our training director out there about taking
4  it to arbitration. And exactly the details, I
5  can't recall.
6     Q.  Well, Mr. Gallagher, you think there is
7  a conflict by Mr. Milne's failure to disclose
8  information as it related to the matter involving
9  Local 341. But Mr. Milne's son was involved in at
10 most with 942 or with the apprenticeship program;
11 is that fair to say?
12    A.  I, as a trustee, set a lot of the rules
13 and policies along with several other trustees.
14 I'm a trustee on the Alaska Labor apprenticeship
15 program.
16    Q.  Didn't you then have a trust obligation
17 to inquire about Mr. Milne's status with Local 942
18 with the apprenticeship program before you picked
19 him?
20    A.  No, I didn't.
21    Q.  Then what is the conflict? If you see a
22 conflict now, why didn't you check it out before
23 Mr. Milne was picked and went through the
24 arbitration?
25    A.  It never dawned on me to call 942 or

Page 26

```
 1  check with our apprenticeship program.  It never
 2  came to my -- I never even -- it never even popped
 3  into my mind.  I rely on my general counsel to do a
 4  lot of this work for me, and I believe that if a
 5  person has a conflict, like I believe the
 6  arbitrator did, and Mr. Johnson you were there that
 7  morning when the arbitrator said he had no
 8  conflicts and no dealings with anybody in either of
 9  the parties.  And I -- whether he did intentionally
10  or not, I have no idea but --
11      Q.  What party --
12      A.  Can I finish?
13      Q.  I'm sorry.  I didn't mean to interrupt
14  you, sir.
15      A.  When he told us he had no dealings with
16  any of us, if the arbiter would have told me that
17  his son had applied for Alaska Laborers
18  apprenticeship and has not been picked, not once
19  but twice, I would have raised a major conflict
20  because I'm a parent.  I know how protective I am
21  of my children.  That's just a parent, we are very
22  protective of our siblings (sic).
23      Q.  Mr. Gallagher, I do apologize for
24  interrupting you, but at the arbitration proceeding
25  do you remember Mr. Milne's saying that he had no
```

Page 27

```
 1  conflict with Local 942?  That he no conflict with
 2  the apprenticeship program; do you remember him
 3  saying that?
 4      A.  No, I don't know.
 5      Q.  Do you remember him saying he had no
 6  conflict with Local 341?
 7      A.  Yes.
 8      Q.  So you take the conclusion that the
 9  alleged relationship with 942 and the
10  apprenticeship program is a critical issue in terms
11  of his ability to sit on a matter involving Local
12  341, why didn't you undertake an inquiry of 942 or
13  the apprenticeship program to find out if there was
14  some conflict?
15      A.  I did not do it.  I don't know why.
16      Q.  Did you instruct anybody to do it?
17      A.  I don't believe I did.
18      Q.  When did you first hear that Clark Milne
19  was being considered as a possible candidate for an
20  arbitrator position in this matter?
21      A.  What is the question?
22      Q.  When did you first hear of Clark Milne
23  as a possible arbitrator in the Steve Pope matter?
24      A.  I'm not sure.  It was a week or before,
25  approximately, of the arbitration.  I left that up
```

Page 28

```
 1  to my general counsel to pick the arbitrator.
 2      Q.  I'm going to show you what was marked as
 3  Exhibit 1 in the deposition of Mr. Milne.  Have you
 4  seen that letter dated June 6, 2005?
 5      A.  I don't recall.  I very -- I may have,
 6  yes.  Do I recall it, no.
 7      Q.  Were you involved in the decision, in
 8  fact, to select Mr. Milne as distinct from Mr.
 9  Bledsoe or anyone else?
10      A.  I left it up to my general counsel.
11      Q.  I don't want to invade your
12  attorney/client privilege, but did you talk about
13  the subject of who ought to be selected with your
14  general counsel?
15      A.  I had discussions with my general
16  counsel, yes.
17      Q.  Did you offer input as to whether Mr.
18  Milne was an appropriate candidate or not?
19      A.  I just told him to pick somebody that
20  was fair.
21      Q.  Do you have any knowledge as to why
22  Abraham Milne was not selected to the
23  apprenticeship program in 2004, 2005?
24      A.  No, I don't.
25      Q.  Have you asked anybody about it?
```

Page 29

```
 1      A.  I have heard.  I have -- I have asked
 2  why he was not rated high.  Yes, I did ask that
 3  question.
 4      Q.  What did you hear as a response to that
 5  question?
 6      A.  You know it's been about five, six,
 7  seven months now.  One reason, I believe, is that
 8  he was a little slow.
 9      Q.  Slow in terms of mental capacity; is
10  that what you're referring to?
11      A.  I'm not sure what they were referring
12  to, whether it was mental or physical.  I don't
13  know.  What it is is that it wasn't -- it was a
14  selection process based on average scores and his
15  score was not as high as the other applicants.
16      Q.  Is that a fairly routine occurrence that
17  folks are let go or not selected because their
18  score is not as high as the average?
19      A.  Well, if you have -- hypothetically, if
20  you have 50 people applying for the apprenticeship
21  program and you're going to take in 20 people, the
22  top 20 people with scores would be the ones that
23  you would pick.  The other 30 -- and sometimes it's
24  a real close call.
25          Sometimes I wish had more positions
```