Page 30

1  available because you had some good candidates, but
2  sometimes it's just the way a person interviews,
3  their knowledge of the industry, attitude.
4      Q.  Do you recall any discussions with
5  anybody whether young Mr. Milne was close in
6  meeting the cut or was he significantly under the
7  average mark of those that were accepted?
8      A.  Don't me hold me to this because it's
9  been six, seven, eight months since we have had
10 this discussion, but I believe they really wanted
11 to pick him as an apprentice, from what I gathered,
12 because he not only applied once but twice. So he
13 was showing a lot of interest in wanting to be part
14 of the Laborers apprenticeship program. But they
15 just didn't -- they just didn't get it done.
16     Q.  Did young Mr. Milne appeal or protest
17 the decisions at all to your knowledge?
18     A.  Not to my knowledge.
19     Q.  Is there a process to do that if one
20 wanted to do that?
21     A.  We have more appeals -- yes, we do have
22 a process.
23     Q.  But he did not appeal?
24     A.  Not to my knowledge, no.
25     Q.  To your knowledge, did his father Clark

Page 31

1  Milne make any kind of an issue with anybody about
2  it?
3      A.  Just third -- just second-handed. Tim
4  Sharp, my counterpart in Fairbanks, indicated that
5  he had a conversation with Mr. Milne. I don't know
6  all the details of that conversation.
7      Q.  Was it your understanding that that
8  conversation was reflected in the affidavit that
9  Mr. Sharp provided in this litigation?
10     A.  I believe so.
11     Q.  About how long does it take, if you
12 know, between when a person is interviewed for the
13 apprenticeship program and told whether they have
14 been accepted or not?
15     A.  It varies.
16     Q.  You don't have any knowledge about that,
17 at least in 2005 if the representation is accurate,
18 that Abraham Milne interviewed in May of 2005 for
19 the Laborers apprenticeship program in Fairbanks?
20 You don't know when the rejection notices or
21 acceptance notices went out?
22     A.  No, I don't.
23     Q.  Now, Local 341 enters into a collective
24 bargaining agreement with employers as Local 341;
25 is that correct?

Page 32

1      A.  No. Yes and no.
2      Q.  I'm going to hand you what was marked as
3  Exhibit 2 to the Clark Milne's deposition. Have
4  you seen that before?
5      A.  I believe so, yes.
6      Q.  Is this a Plant Agreement between
7  Laborers International Union of North America
8  AFL-CIO Alaska District State Council Laborers
9  Local 341 and AS&G?
10     A.  Yes, it is.
11     Q.  So this is a CBA, collective bargaining
12 agreement between Local 341 and AS&G; is that
13 right? Is that what it is?
14     A.  The Alaska State District Council of
15 Laborers' Local 341.
16     Q.  Is that the full name for Laborers Local
17 341?
18     A.  We use different things under our Alaska
19 State District Counsel of Laborers, which I
20 indicated earlier is made up of three locals up
21 here; Local 942 and Local 71 and Local 341. And we
22 use the district council's name at times like our
23 master agreement this here agreement, because it is
24 specific to our geographical area; it is negotiated
25 by Laborers Local 341. Our master agreement is

Page 33

1  negotiated with Local 942 and Local 341 because
2  that is a statewide agreement similar to our
3  training trust, our pension, health and welfare.
4      Q.  So while there may be a statewide
5  agreement, the one with 341 and AS&G was a local
6  agreement; is that correct?
7      A.  Yes, sir.
8      Q.  And this agreement is not between Local
9  942 and AS&G, is it?
10     A.  No, it's not.
11     Q.  And it's not between the Laborers
12 apprenticeship program and AS&G, is it?
13     A.  Yes, it is.
14     Q.  This is between the apprenticeship
15 program and AS&G?
16     A.  Anchorage Sand and Gravel contributes to
17 our apprenticeship training program.
18     Q.  While it may have an obligations even
19 under this collective bargaining agreement to
20 contribute, is this agreement actually between the
21 apprenticeship program and AS&G?
22     A.  The fringe benefits; the negotiated wage
23 that we negotiate with Anchorage Sand and Gravel.
24 Every year we go out to the membership and we ask
25 them what they want to put into the Alaska Laborers

Page 34

1 Pension Plan, Alaska Laborers Medical Plan, Alaska
2 Laborers Training Plan and Alaska Laborers Legal
3 Plan.
4     At that time those monies are then,
5 whatever we decide on what we want as contribution
6 rates to those specific plans, the contractor pays
7 into the those plans and part of that negotiated
8 wage is part of the Alaska Laborers training
9 school.
10    Q.  But in reaching that agreement, in
11 reaching an agreed upon contribution rate, that was
12 part of the collective bargaining agreement that we
13 are talking here, that has been marked as Exhibit
14 2, between Local 341 and AS&G?
15    A.  Yes.
16    Q.  The dispute that was actually being
17 arbitrated by Mr. Milne involved the termination of
18 an employee represented by Local 341, correct?
19    A.  Yes.  We are the agencies that
20 represented Mr. Pope in his arbitration, yes.
21    Q.  Local 942 didn't represent Mr. Pope?
22    A.  No.  But Kevin Dougherty actually was
23 our general counsel that works for Alaska State
24 District Council of Laborers Local 341, Laborers
25 Local 942 and Laborers Local 71.

Page 35

1     Q.  And given that Mr. Dougherty is in that
2 position, would he then have access to ask
3 questions as far as you know of Local 942 or the
4 apprenticeship program regarding information they
5 might have about a variety of issues?
6     A.  I believe he would, yes.
7     Q.  So do have you any knowledge of whether
8 Mr. Dougherty in his capacity as general counsel
9 for the District Council of Laborers in fact
10 inquired of Mr. Milne's alleged conflict status
11 with 942 or the apprenticeship program?
12    A.  The only person that I recollect that
13 Mr. Dougherty talked to was Jim Astin with Local
14 71.  That's because -- and probably the reason is,
15 and I have would have ask Mr. Dougherty, is Local
16 71 does a lot the arbitrations.  Their agents are
17 trained to do arbitrations.  Whereas, Local 942 and
18 341 we rely solely on Mr. Dougherty, at that time
19 to do our arbitration.  Mr. Dougherty has helped
20 and done arbitrations for Locals 71, but he
21 exclusively does all of ours for 341 and 942.
22    Q.  From these various sources, Local 71,
23 Local 942, the apprenticeship program and Local
24 341, nobody came up with any information, if you
25 will the Union side of the situation, about Mr.

Page 36

1 Milne's relationship with an applicant to the
2 apprenticeship program?
3     A.  Not to my knowledge.
4         MR. JOHNSON:  Thank you, Mr. Gallagher,
5 I don't have any further questions for you.
6              EXAMINATION
7 BY MS. DRYGAS:
8     Q.  If I could just take one minute.  Mr.
9 Gallagher, I want to revisit something briefly that
10 Mr. Johnson discussed.  Les Louinger, can you
11 explain his position with the training program?
12    A.  Les Louinger is director of the Alaska
13 Laborers Training School and Alaska Laborers
14 apprenticeship program and he answers directly to
15 myself and the other trustees.
16    Q.  Okay.  So he oversees the programs that
17 are in Anchorage and Fairbanks?  He is the director
18 of those programs?
19    A.  Yes.
20    Q.  And because I think there was a little
21 bit confusion, as for the trustees that are members
22 of the Laborers Union, can you tell me who those
23 trustees are?
24    A.  There's two trustees from Fairbanks.
25 One of the trustees is Tim sharp.  He is the

Page 37

1 business manager, secretary-treasurer of Local 942.
2 Dan Simonian is the president of Local 942.  In
3 Anchorage, Ron McFeeeders is the trustee and vice
4 president of Laborers Local 341.  And, myself, Mike
5 Gallagher, businesses manager, secretary-treasurer
6 of Laborers Local 341.
7     Q.  You mentioned a name who was placed in a
8 list of our potential arbitrators for this
9 discussion, Bledsoe.  Would that be Mark Bledsoe?
10    A.  I believe that is name.
11    Q.  Why did you feel there was a conflict;
12 can you state that again?
13    A.  Approximately five, six --
14 approximately, it may have a been little longer or
15 little less, through our trust fund Mr. Bledsoe
16 represented all of our trust funds in that our
17 normal attorney which is Randy Simpson with Jermain
18 Dunnagan and Owens was conflicted out and we had to
19 get outside counsel on a collection matter.
20         We had a contractor that wasn't paying
21 their contributions to the pension, health and
22 welfare, training and legal funds.  We had to go
23 out and get counsel and Mark represented us at that
24 time, Mr. Bledsoe did, I believe it was.  And when
25 I heard that name, I disclosed it to my general

Page 38

1  counsel Kevin Dougherty.
2      Q.  And he represented the trust fund on
3  matter and that trust fund is paid into by both 942
4  and members of 942 and 341 and the employers?
5      A.  Yes.
6      Q.  Do you recall to your knowledge did Mr.
7  Dougherty contact Mr. Johnson, counsel for
8  Anchorage Sand and Gravel to let them know?
9      A.  I believe Mr. Dougherty did.  I
10 requested that he let Counsel on the other side
11 know.
12     Q.  When you learned about the arbitrator
13 Clark Milne's son being rejected from the Laborers
14 Apprenticeship Program, did you confront AS&G,
15 Anchorage Sand and Gravel, with that information?
16     A.  Yes, I did.
17     Q.  Who at AS&G did you give that
18 information to?
19     A.  I believe I talked to Mr. Dale Morman and
20 Mr. Steve Lovs, I think.  I believe we had sit-down
21 meeting.  I called them and talked to them on the
22 phone and, I believe, I asked for a meeting.
23 I told them I just became aware of an issue and I
24 wanted to sit down and discuss with, I believe, it
25 was Mr. Morman for sure Mr. Lovs may have been

Page 39

1  there.
2          We discussed the issue about when I
3  found out that the arbitrator's son had not been
4  picked, not once but twice, for the Laborers
5  apprenticeship and that the arbitrator did not
6  disclose his ties with the his family members
7  through Alaska Laborers apprenticeship program.  I
8  was very concerned about him not mentioning a
9  conflict, which I believe is accurate.
10     Q.  Mr. Morman and Mr. Lovs, what are
11 their positions with AS&G?
12     A.  Their exact titles, I'm not sure.
13     Q.  Best estimate?
14     A.  Mr. Morman is head of anchorage Sand
15 and Gravel and Mr. Lovs is one of the
16 superintendents and general managers there.
17     Q.  Okay.  When you confronted them, how did
18 they respond to that information, Mr. Morman and Mr.
19 Lovs?
20     A.  The conversation that we had, Mr.
21 Morman took it very serious.  He said let me do some
22 research.  He did.  He got back to me a week
23 or two later, whatever that was, maybe three weeks
24 later, and indicated to me that he didn't think
25 that it was a conflict of interest and that he had

Page 40

1  no desire at this time to -- Mike's recommendation
2  was to just pick another arbitrator and
3  re-arbitrate it.
4          And like I said earlier, this is the
5  first time in our history.  And even though we
6  don't do a lot of arbitrations, we have done our
7  fair share over the 30 years I have been involved.
8  This is first time this has ever happened that we
9  found out that there was, we believe, a conflict.
10     Q.  And you said you have been with the
11 Local for how many years?
12     A.  Almost 31 years.
13     Q.  Okay.  Mr. Gallagher, do you believe
14 that it was the arbitrator's duty and not your duty
15 or the Local's duty to discover or disclose this
16 type of information about Abraham Milne?
17     A.  I believe it's the arbitrator's duty to
18 disclose any conflict just like he did that morning
19 at the outset of our arbitration.  He indicated
20 that there was no conflicts between the parties and
21 he had no dealings with them and in, like, I'm
22 saying it -- he may not have recognized it.
23         I don't know that.  But he may have
24 forget to mention it that morning, I don't know.
25 He seems like a very honest person.  But when I

Page 41

1  found out that his son was not picked for the
2  apprenticeship, not once but twice -- I'm a parent
3  just like any other parent.  I'm a very protective
4  person with my children, and I believe most people
5  are.
6      Q.  Let me think how to phrase this.  It is
7  your opinion that the onus was not upon you to
8  research whether the arbitrator had a son, whether
9  he had applied as one of the many applicants of
10 apprenticeship program?  Do you believe -- is it
11 your opinion that that onus was not upon you to
12 discover that type of information?
13     A.  I believe, if I would have been the
14 arbitrator, I would have disclosed if my son had a
15 relationship with one of the parties.
16     Q.  Do you believe it was your duty to
17 discover that information?
18     A.  No, I don't.  I believe that it was the
19 arbitrator's duty to disclose the conflict.  And
20 then it was up to the two parties to decide whether
21 or not they felt it was a conflict.
22     Q.  If you had been aware of the fact that
23 arbitrator's son, Abraham, had been rejected from
24 the Laborers apprenticeship program, would you have
25 agreed to the selection of Clark Milne as your

Page 42

1  arbitrator?
2      A.  No, I would not have.
3          MS. DRYGAS:  That's all I have.
4              EXAMINATION
5  BY MR. JOHNSON:
6      Q.  Just a follow up.  Mr. Gallagher, you
7  indicated you had a sit-down conversation with at
8  least Dale Morman or Steve Lovs.  Did either or
9  both of those folks ask you a series of questions
10 to provide them further information by way of
11 verifying what you were suggesting?  Do you
12 remember any kind of a list of questions either
13 being presented to you orally or in writing?
14     A.  I believe, there was something, yes.  I
15 don't know if it was orally or if he gave me the
16 questions written.  It could have been either one
17 of them.  I do remember getting back with him with
18 some of the information, yes.
19     Q.  Do you remember what information you
20 provided him at that time?
21     A.  I would have to research it.  I have a
22 file at my office, I could tell you what I told him
23 or what I sent him.
24     Q.  Do you have a recollection of providing
25 him some written information?

```
 1         A.   I believe, I did.  I believe it was --
 2   it may have been -- I would have to research my
 3   records so don't hold me to this, but I believe it
 4   was information from our training director, Mr.
 5   Louinger, stating that his son, the arbitrator's
 6   son, had applied in 2004-2005 for the
 7   apprenticeship program.
 8         MR. JOHNSON:  Thank you.  That's all my
 9   questions.
10         (Proceedings concluded at 4:15 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```