**Page 2**

```
 1    IN THE UNITED STATES DISTRICT COURT FOR
 2       THE DISTRICT OF ALASKA AT ANCHORAGE
 3
 4   LABORERS LOCAL 341,
 5       Plaintiff,
 6   vs.
 7
     ANCHORAGE SAND AND GRAVEL
 8   COMPANY, INC.,
 9       Defendant.
     _____/
10   Case No. A05-250 CV (JWS)
11
12
13       DEPOSITION OF CLARK MILNE,
14   taken on behalf of the defendant, pursuant to notice
15   at the offices of Wohlforth, Johnson, Brecht, Cartledge
16   & Brooking, Anchorage, Alaska, before Patta K. Johnson,
17   Shorthand Reporter for Alaska Stenotype Reporters and
18   Notary Public in and for the State of Alaska.
19
20
21
22
23
24
25
```

**Page 3**

```
 1           APPEARANCES
 2
 3   For the Defendant:  WOHLFORTH, JOHNSON, BRECHT,
                         CARTLEDGE & BROOKING
 4                       By: Robert Johnson
                         900 West Fifth Avenue
 5                       Suite 600
                         Anchorage, Alaska 99501
 6                       907-276-6401
 7   For the Plaintiff:  GENERAL COUNSEL ALASKA STATE
                         DISTRICT COUNCIL OF LABORERS
 8                       By: Heidi Drygas
                         2501 Commercial Drive
 9                       Suite 140
                         Anchorage, Alaska 99501
10
11
12   Also Present:   Kevin Dougherty, General Council
                     Alaska District Council of Laborers
13
14
15
16
17
18
19
20
21
22
23   Reported By: Patta K. Johnson
24
25
```

**Page 4**

```
 1
                     I N D E X
 2
 3
     EXAMINATION BY:                         PAGE
 4
 5   Mr. Johnson                             5, 32
 6   Ms. Drygas                              21
 7
 8
 9
10
11
     EXHIBITS:
12
13   Exhibit 1                               8
14   Exhibit 2                               9
15   Exhibit 3                               11
16   Exhibit 4                               12
17   Exhibit 5                               23
18   Exhibit 6                               26
19   Exhibit 7                               29
20
21
22
23
24
25
```

**Page 5**

```
 1   Whereupon,
 2             CLARK MILNE,
 3   called as a witness herein having been duly sworn
 4   upon oath by Patta K. Johnson, Notary Public, was
 5   examined and testified as follows:
 6             EXAMINATION
 7   BY MR. JOHNSON:
 8       Q.  Mr. Clark, for the record, please state
 9           your name and spell your last name?
10       A.  My name is Clark Milne, C-l-a-r-k,
11           M-i-l-n-e.
12       Q.  What is your address, Mr. Milne?
13       A.  I live in Fairbanks, 1119 Coppet, C-o-
14           p-p-e-t, Street, Fairbanks 99709.
15       Q.  Mr. Milne, have you been involved in a
16           deposition before?
17       A.  Yes, but it has been a decade or so.
18       Q.  Just as a refresher, I'm going to ask
19           you questions and, of course, I appreciate
20   your
21           best answers to them.  You are under oath
22   and it is
23           anticipated your deposition could be used
24   at trial,
25           and, certainly, motion practice in this
```

Page 6

1  particular
2  case.
3        If I ask a question that makes no sense,
4  if you don't understand it or it's unclear, let me
5  know and I will try to rephrase it. The
6  examination -- as you know, we are dealing with
7  situations arising out of your tenure as an
8  arbitrator in a particular proceeding; is that
9  correct?
10       A. Yes.
11       Q. Were you, in fact, an arbitrator in a
12 proceeding regarding my client Anchorage Sand and
13 Gravel, Inc., and Laborers Local 341?
14       A. Yes, I was.
15       Q. And did you render a decision in that
16 matter?
17       A. Yes, I did.
18       Q. Now, have you been provided with any
19 documents related to pleadings in the lawsuit in
20 this matter?
21       A. Yes. I got an e-mail from you with a
22 set of documents.
23       Q. Do you understand that Local 341 is
24 challenging and seeking to vacate the arbitrational
25 order that you entered?

Page 7

1        A. Yes. That was the first that I learned
2  of it.
3        Q. Is it your understanding that they are
4  seeking to challenge it on the basis of an alleged
5  non-disclosure by you of certain information?
6        A. Yes.
7        Q. Now, Mr. Milne, I don't think, and
8  Counsel for the Union can certainly interject, I
9  don't think anybody is actually challenging the
10 actual -- any kind of actual allegation of bias in
11 your award. Can you distinguish between an actual
12 claim of bias as opposed to simply a non-disclosure
13 issue; is that a meaningful distinction to you?
14       A. Yes.
15       Q. My questions are going to go to this
16 non-disclosure issue. I'm not going to talk about
17 bias. So if my questions seem to go to bias, let
18 me know because my questions are going to be on the
19 non-disclosure side of things. Mr. Milne, how long
20 have you served as an arbitrator?
21       A. Approximately, 20 years. My first
22 arbitration was in 1986.
23       Q. Do you have any recollection of any of
24 your decisions being vacated by order of the court?
25       A. No. Absolutely not.

Page 8

1        Q. Have you ever had one of your orders
2  challenged on the basis of non-disclosure of any
3  item?
4        A. No.
5        Q. So nobody has even made that challenge
6  much less having a decision of yours vacated?
7        A. Correct. No one has made that
8  challenge.
9        Q. Do have a recollection of how the
10 parties approached you in regard to this particular
11 arbitration?
12       A. I believe it was a phone call at home
13 and I responded in that way.
14       (Exhibit 1 marked for identification.)
15 BY MR. JOHNSON:
16       Q. Mr. Milne, I have handed you Exhibit 1.
17 Does that letter look familiar to you?
18       A. Yes.
19       Q. Are you going to get your glasses?
20       A. Yes.
21       Q. And does the letter describe the issue
22 between Anchorage Sand and Gravel, Inc., and
23 Laborers Union International Local 341?
24       A. Yes, it does.
25       Q. And is this letter signed by me as

Page 9

1  counsel for Anchorage Sand and Gravel and Mr.
2  Dougherty, general counsel for Alaska State
3  District Council of Laborers?
4        A. Yes, I see it is.
5        Q. And when you received this letter, did
6  you provide any information concerning your
7  availability and dates for a potential hearing as
8  well as a schedule for your fees?
9        A. Yes, I did.
10       Q. Had you ever had any relationship
11 whatsoever with Laborers Local 341?
12       A. Only in working in construction. And by
13 that I mean as a superintendent, at times, I would
14 hire through the union.
15       Q. When you are referring to the union are
16 you talking specifically Laborers Union Local 341
17 or some other local?
18       A. It was the Laborers Union with a local
19 -- I did work here in Anchorage too, so I imagine
20 I dealt with 341 here.
21       Q. Do you know if there is a different
22 local in Fairbanks?
23       A. I honestly don't know, clearly.
24       (Exhibit 2 marked for identification.)
25 BY MR. JOHNSON:

Page 10

1   Q. Mr. Milne, I'll represent to you this
2 was sent to you early on as a description of what
3 your mandates might be in this case. Does this
4 look familiar at all?
5   A. Yes, it is.
6   Q. What does this appear to be? The cover
7 sheet appears to be what?
8   A. The collective bargaining agreement, the
9 plant agreement as it says there between the union
10 and the owner or the employer.
11   Q. And the second page, is that an article
12 having to do with settlement of disputes?
13   A. Yes, Article 15.
14   Q. Is it fair to say this article calls for
15 a three-person panel with the employer selecting
16 one member and the union selecting one member and
17 the two selecting a third?
18   A. Yes.
19   Q. Was it your understanding that the
20 parties agreed to do it in a different fashion than
21 what was provided in this situation?
22   A. Yes. It was told, or written, I don't
23 remember, but it was agreed by both parties that
24 they were going to use a single arbitrator.
25   Q. Is there anything in Article 15 that is

Page 11

1 in front you that refers to a specific source of
2 jurisdictional rules that you were to apply? For
3 example, AAA or the National Association of
4 Securities Dealers or some other standard?
5   A. No, I don't see any reference like that.
6   Q. Ultimately, did you in fact serve as
7 arbitrator?
8   A. Yes, I did.
9   Q. Do you remember what the dates were that
10 you served as an arbitrator?
11   A. I don't remember when the hearing was.
12 But I brought a copy of the decision, so I know it
13 was wrapped up when the decision was posted on July
14 5, 2005.
15   Q. Okay. Now the arbitration, when it took
16 place, occurred down here in Anchorage; is that
17 correct?
18   A. Yes, it did.
19     (Exhibit 3 marked for identification.)
20 BY MR. JOHNSON:
21   Q. What is that document, if can you tell
22 me?
23   A. It says Affidavit of Michael Gallagher.
24   Q. And if I could draw your attention to
25 paragraphs four and five on page 2?

Page 12

1   A. Yes.
2   Q. And you see there is a reference to the
3 date when the arbitration took place?
4   A. Yes. I see it mentions June 29, 2005.
5   Q. Is that consistent with your
6 recollection?
7   A. I don't remember the date, so it's not
8 inconsistent.
9   Q. All right. Mr. Milne, do you have a son
10 named Abraham Milne?
11   A. Yes, I do.
12   Q. And how old is your son?
13   A. Just a second, 21.
14   Q. Okay. And does Abraham, do you mind if
15 I call him Abraham?
16   A. No, that's fine.
17   Q. Does Abraham live in your place of
18 residence?
19   A. Yes, he does.
20   Q. Has he been living in your place of
21 residence for the last two or three years?
22   A. Since he returned from school, yes.
23   Q. When did he return from school?
24   A. He return from school in June, 2004.
25   Q. What school did he return from?

Page 13

1   A. He went to a AvTeck which is a
2 vocational technical school down in Seward.
3   Q. Okay. Has Abraham applied for various
4 jobs around the state?
5   A. Yes, he has.
6   Q. Has he applied for jobs in Fairbanks?
7   A. Yes, he has.
8   Q. Do you have any knowledge of his having
9 applied to participate in the Laborers
10 apprenticeship program?
11   A. Yes.
12   Q. Did he apply for that more than once?
13   A. He has applied three times.
14   Q. What dates were those, if you recall?
15   A. I don't recall.
16   Q. Do you understand anything about the
17 process of applying with the apprentice program?
18 Do you know what it consists of?
19   A. I know a little bit about the process
20 from what he told me.
21   Q. What did he tell you?
22   A. He told me he had been aware -- we had
23 encouraged him to approach unions. And he
24 approached the Laborers and the Carpenters and got
25 some paperwork; got an appointment for an interview

Page 14

1  and, I believe, in the instance of the Laborers, he
2  took a test, a written test.
3      Q. Was he successful in the test or the
4  interview process with the apprentice program?
5      A. No, he wasn't.
6      Q. What was his goal with respect to taking
7  these tests or undertaking these interviews with
8  the apprentice program?
9      A. He was hoping to enter the Laborers
10 apprenticeship program.
11     Q. That was in Fairbanks?
12     A. Yes. And to clarify too, as I
13 mentioned, he applied to both the Laborers and
14 Carpenters. That is why I said three times.
15     Q. And was he successful in the process
16 with the Carpenters as well as the Laborers?
17     A. No, he wasn't.
18     Q. What was your understanding why he was
19 unsuccessful?
20     A. My understanding is they had a lot of
21 applicants and he didn't make the cut. He wasn't
22 among those they did select and entered that
23 apprenticeship program.
24     Q. Was his goal to work with the
25 apprenticeship program and work in Fairbanks?

Page 15

1      A. He would have worked anywhere they had
2  work, I imagine. I'm sure he was at least hoping
3  the apprenticeship program would be in Fairbanks.
4      Q. Was the apprenticeship program offered
5  in places other than Fairbanks, if you know?
6      A. I don't know.
7      Q. Do you remember having a reaction of any
8  kind when Abraham was telling you that he was
9  unsuccessful in his ventures with the Laborers
10 apprenticeship program?
11     A. I don't remember any reaction in
12 particular.
13     Q. Was Abraham disappointed?
14     A. Yes, I think he was disappointed. He
15 had hoped to be able to get in. I'll volunteer
16 that I don't think he was surprised because it's
17 very competitive. He had mentioned there were a
18 number of people. He was fairly upbeat and I think
19 it's worth volunteering that indeed that's why he
20 ended up applying the second time and again was not
21 successful.
22     Q. Was his lack of success in both of those
23 instances -- was it a moment of particular import
24 to you?
25     A. No.

Page 16

1      Q. How did he go about even describing to
2  you that he was unsuccessful? Was it over dinner
3  or how did that come about?
4      A. I am trying to remember if he got a
5  letter first or if he got a call. I'm pretty sure
6  he just got a letter and it was kind of an oh,
7  shucks it didn't work out, the Laborers didn't end
8  up accepting me.
9      Q. It was your understanding there were a
10 lot of applicants for those positions both with
11 respect to both the first time and the second time
12 he applied with the Laborers apprenticeship
13 program?
14     A. Yes, it's been my impression since the
15 time I was in construction, working and hiring
16 people, that there was quite a bit of competition.
17 There is a lot work, there is lot of applicants.
18 Abe had friends that applied and had entered and
19 had gone into various trades.
20     Q. Was there anything about Abraham's lack
21 of success in getting into the Laborers
22 apprenticeship program that led to any protests or
23 appeals of the decisions relating to his not being
24 successful?
25     A. No, not at all.

Page 17

1      Q. Did you do anything in particular on his
2  behalf following his statement to you that he was
3  unsuccessful in applying?
4      A. No.
5      Q. Did you have any feelings of animosity
6  toward the Laborers Union, generally, or Laborers
7  apprenticeship program as a consequence of
8  Abraham's failure to get into those programs?
9      A. No, absolutely not.
10     Q. What about with respect to the
11 Carpenters Union?
12     A. No.
13     Q. Now --
14        (Exhibit 4 marked for identification.)
15 BY MR. JOHNSON:
16     Q. Mr. Milne, I have you handed you Exhibit
17 4. The reference is made by a training director
18 that in June of '04 and May of '05, Abraham Milne
19 was interviewed and that he was not selected and
20 may apply if he so chooses. Is that what this
21 document provides?
22     A. Yes.
23     Q. Is there anything about those dates that
24 suggest they're in error or is there any reason to
25 believe they are not correct?

## Page 18

1  A. I'm confident these are valid dates.
2  Q. Now the second one, though, May 4 of
3  '05, drawing your attention back to the first
4  document that I provided to you which is an inquiry
5  letter of June 6, 2005, was there a May 4, or at
6  least I should say the second time when Abraham was
7  unsuccessful in applying for the apprenticeship
8  program, was that issue on your mind at all when
9  you received the letter of June 6, 2005 asking
10 about your availability?
11 A. No, it wasn't.
12 Q. Did you have a discussion with a
13 gentleman by the name of Tim Sharp regarding the
14 apprenticeship program and your son?
15 A. Yes, I did.
16 Q. Did you have that discussion about May
17 of 2004?
18 A. I --
19 Q. Excuse me, strike that. In about August
20 of 2004 -- can't read my own handwriting.
21 A. I would have guessed September or
22 October, but it was fall of 2004.
23 Q. And what discussion did you have with
24 Mr. Sharp about the apprenticeship program?
25 A. The context will help here. We were

## Page 19

1  moving the Coal Bunkers, so it is easily ratified
2  exactly which date it was, and Abe and I were
3  pulling a fence post so we could bring this large
4  object through this gate.
5  Q. Why were you doing that? Was it
6  voluntary work?
7  A. Yeah, it was just a charitable,
8  volunteer sort of activity. And part of the stuff
9  we were going to do potentially would involve the
10 Laborers Union, too. And so Tim was going to bring
11 some tool or something and in particular himself
12 and gloves.
13     He arrived in a forklift or small loader
14 backhoe or something so we could pull that post
15 which was quite heavy and Abe and I were together
16 on this sunny weekend afternoon and I introduced
17 Abe. Tim knew me, but didn't know Abe. So I said,
18 Hi, this is Abe and I do fuzzily remember saying
19 he's applied, you never know what will happen, good
20 labor candidate.
21 Q. This is Mr. Sharp saying that to you?
22 A. No, I said that to him. I was
23 introducing Abe because I wasn't sure he would
24 necessarily know who he was.
25 Q. And what did Mr. Sharp say?

## Page 20

1  A. Oh, Hi -- or I don't remember, so I
2  will just stop there. I don't remember what he
3  said. I remember the conversation that that was a
4  topic kind of in a jocular sense, and we went back
5  to work. He was as little late and kind of
6  apologetic and set the stage and we got on with
7  what we were there for.
8  Q. Do you know other members of the
9  Laborers Union besides Tim Sharp up in Fairbanks?
10 A. Yes. I'm not sure I could come up with
11 any names. I have to differentiate. I know people
12 at several unions, but I can't come up with any
13 names. But yes, if there were four or five
14 different people working for the Laborers Union, I
15 would probably know them and be able to pick them
16 out of a photo.
17 Q. Have you done any work as an arbitrator
18 for any Laborers Union in Fairbanks?
19 A. No.
20 Q. With respect to any persons affiliated,
21 as you knew it, with a Laborers Union in Fairbanks,
22 did you ever complain about Abraham's failure to be
23 admitted to the apprenticeship program?
24 A. No. And let me extend that to say I
25 wasn't complaining on that day that I had that

## Page 21

1  brief conversation with Mr. Sharp either. Like I
2  said, it was more of an introduction and stage
3  setting. But no, I hadn't complained to anyone
4  about his not getting into the Laborers Union.
5      MR. JOHNSON: I don't have any further
6  questions, Mr. Milne. Thank you.
7          EXAMINATION
8  BY MS. DRYGAS:
9  Q. Mr. Milne, I'm Heidi Drygas. I'm
10 general counsel for Laborers Local 341. I don't
11 want to cover any ground we have covered, so I'll
12 try to pare down my questions. What do you do full
13 time in addition to being an arbitrator?
14 A. Right. My normal full time job is I
15 work at the Department of Transportation in Public
16 Facilities in Fairbanks for the Northern Region as
17 Northern Region maintenance engineer.
18 Q. How long have you worked in that
19 position or with the State actually?
20 A. Two years in that position having worked
21 about a decade ago for four years as the
22 maintenance director.
23 Q. So a lot of the questions have been
24 answered, but were you aware your son applied for
25 the Laborers Apprenticeship Program in June 2004?

Page 22

1   A. Yes.
2   Q. Did you encourage him to apply?
3   A. Yes, I did.
4   Q. And I just want to make sure that we are
5   clear that Abe did, in fact, live with you at the
6   time he applied for the apprenticeship program in
7   June of '04?
8   A. Yes, he did.
9   Q. I want to revisit the conversation you
10  had with Tim Sharp in Fairbanks. First, let me
11  give you this so we can clarify the date. This
12  doesn't need to be an exhibit. This is a copy off
13  the web of the Fairbanks Coal Bunkers Project.
14  A. Okay.
15  Q. And I just want to show you that
16  paragraph and it also gives the date of what day
17  that work was completed. Can you verify that the
18  work was completed on August 17, 2004?
19  A. Yes. This refreshes my memory nicely.
20  The guy who maintains this website is Randy Griffen
21  and therefore I'm confident this is right. I just
22  thought it was later in the fall, it was kind of
23  chilly, and, yes. Yes.
24  Q. Okay. Thank you. Now, when you had
25  this conversation with Tim, you said you couldn't

Page 23

1   remember specifically what conversation took place?
2   A. Yes.
3   Q. Can you we mark this as an exhibit.
4       (Exhibit 5 marked for identification.)
5   BY MS. DRYGAS:
6   Q. If you could look at paragraph six and
7   seven of this affidavit and just briefly review
8   those.
9   A. Okay. I have read it.
10  Q. Would you have any reason to believe
11  that these are not accurate statements by Mr.
12  Sharp?
13  A. No, no reason to believe they were
14  inaccurate.
15  Q. So to the best of your knowledge, would
16  you say these are accurate statements of what
17  conversation probably took place at that time
18  realizing that your memory is a little hazy; it was
19  a year and half ago?
20  A. The two important features in here that
21  I think are probably true, I don't remember, but
22  I'm willing to believe his memory, is that he
23  voiced at that time that Abe could reapply. And
24  then shifting on to seven, there is no question, I
25  did know he had applied and failed to be selected.

Page 24

1   Q. Okay. Thank you. Is it true that Mr.
2   Sharp at that time, if you recall, encouraged your
3   son to reapply for the program?
4   A. I don't remember that.
5   Q. When this conversation with Mr. Sharp
6   took place was Abe there? Was he there for that
7   conversation?
8   A. Yes.
9   Q. Was he involved in participating in that
10  conversation?
11  A. Yes. My memory is that Tim had arrived.
12  He was a little abashed because he was fairly late,
13  jumped out of the rig he was driving which was this
14  backhoe and said something, Gee, I'm here, finally.
15  I said Hi, no problem; we were waiting for you to
16  start; by the way this is Abe.
17      I introduced him immediately so he would
18  know who this guy was. And immediately I said, I
19  don't know if you remember him, he had applied.
20  And he said -- I don't remember if he, Tim,
21  remembered him -- I don't remember that part and
22  then he said, Oh. And then we just moved on and
23  began on strapping on the posts. I don't remember
24  the part, but it is quite plausible that he said
25  just apply again or something.

Page 25

1   Q. And you said you were aware that your
2   son reapplied in May 2005?
3   A. Yes, I was.
4   Q. And you encouraged him to apply the
5   second time?
6   A. Yes.
7   Q. Did Abe live you with in May of 2005?
8   A. Yes.
9   Q. All right. Now, I want to go back to
10  the Pope arbitration. You accepted your
11  appointment as arbitrator in June of 2005?
12  A. Yes, I did.
13  Q. And that was just a month after your son
14  had been rejected for the apprenticeship program
15  the second time?
16  A. It doesn't say he was rejected in May;
17  it says he applied in May. I don't know when he
18  was rejected.
19  Q. Let me rephrase that then. He had
20  applied in May of 2005, and wasn't selected for
21  that particular role?
22  A. Yeah. It mentions in Exhibit 4 that he
23  interviewed May 4. I don't remember when. I'm
24  convinced that whenever the day he got letter or
25  call, and I think he got a letter, that I heard

Alaska Stenotype Reporters

EXHIBIT 7 (Pages 22 to 25)
A
6 of 9

Page 26

```
 1    about it promptly. I don't remember if it was
 2    before or after June -- Exhibit 1 -- June 6.
 3    Because this was -- I did receive Exhibit 1 and I
 4    think this was an e-mail attachment. So you may
 5    want to re ask your question to get a clear answer.
 6        Q.  To the best of your knowledge, you
 7    believe your son received his rejection letter from
 8    the Laborers apprentice program prior to your
 9    receiving this letter on June 6?
10        A.  Understood. And I don't remember if was
11    before or after.
12             (Exhibit 6 marked for identification.)
13    BY MS. DRYGAS:
14        Q.  I want to draw your attention to the
15    last paragraph at the bottom. Are you familiar
16    with this e-mail?
17        A.  Yes. This is my response e-mail early
18    on as we were still communicating by e-mail;
19    globally so both parties were aware of the
20    exchange.
21        Q.  And could you read the last paragraph of
22    that first page. That paragraph that starts with
23    "I am pleased."
24        A.  It's says: "I am please to say that I
25    foresee and infer no conflicts of interest at this
```

Page 27

```
 1    time that would in any way cause me to be unable to
 2    properly and neutrally handle the arbitration of
 3    this dispute. I do not have, and have never had,
 4    any fiscal interest in or direct involvement with
 5    the Laborers Union Local 341, AS&G, these
 6    organizations' employees, or to my knowledge and
 7    particularly the aggrieved individual mentioned in
 8    your letter, Mr. Steve Pope. Please note my time
 9    in the late 1970's and early 1980's working with
10    PKS and Interstate, which was in Anchorage."
11        Q.  And you composed this e-mail?
12        A.  Yes, I did.
13        Q.  Back to the Pope arbitration which
14    occurred in June 2005. Prior to the beginning of
15    that hearing, is it true you stated you had no
16    conflict with either party?
17        A.  Yes, I believe so.
18        Q.  Do you agree that you should have
19    disclosed that fact that Abe had twice been
20    rejected from the apprenticeship program?
21             MR. JOHNSON: Objection. Calls for
22    legal conclusion.
23             THE WITNESS: Please state the question
24    again.
25    BY MS. DRYGAS:
```

Page 28

```
 1        Q.  Do you agree that you should have
 2    disclosed the fact that Abe had twice been rejected
 3    from the Laborers apprenticeship program prior to
 4    accepting your nod as arbitrator?
 5        A.  If it had occurred to me, I would have
 6    disclosed it. I will say that again in a slightly
 7    different way. The reason I didn't disclose it was
 8    I never thought of it. Up to the point of reading
 9    the pleadings, it never occurred to me. Therefore,
10    I never chose not to disclose.
11             If -- let me go still farther. If it
12    occurred to me, if I had thought about the nexus,
13    or, Oh, Laborers-Abe, which I didn't, I think it
14    would have been proper to disclose. I even
15    extrapolate that I would have disclosed it, but,
16    unfortunately, it never occurred to me.
17             And the next direct step from that is,
18    it is my statement too, that, therefore, I didn't
19    participate in any bias or partiality or anything
20    because it never occurred to me. Up until the
21    pleadings, I never thought about Laborers and me
22    including that path.
23             You can tell I'm saying this multiple
24    times because it is in a way an answer to your
25    question. Unfortunately, I never got to your
```

Page 29

```
 1    point. I think, technically, my answer to your
 2    question is no. I couldn't disclose it if I never
 3    thought of it.
 4        Q.  Okay.
 5             (Exhibit 7 marked for identification.)
 6    BY MS. DRYGAS:
 7        Q.  This is an e-mail you sent to the
 8    gentlemen of both parties?
 9        A.  Yes.
10        Q.  On Thursday the 19th of January, a
11    couple of weeks ago. I want to draw your attention
12    to the last paragraph you composed on that first
13    page. First, I want to clear up one thing: When
14    it says in the first and second lines of that
15    paragraph, starting with the second line: "I did
16    not think, feel or act with any impartially in my
17    arbitral service." Can you clarify what you
18    actually meant?
19        A.  Yes. It looks silly now, but I think I
20    would rather strike the "i-m" in impartiality and
21    just as it seems obvious you understood what I
22    meant but it should have said, I did not think or
23    act with any partiality in my arbitral services.
24    Yes. Thank you for helping me to correct that.
25        Q.  No problem. And now, to go to the
```

### Page 30

next -- I think the third and fourth line I underlined for you. In the third and fourth line of the e-mail, would you mind reading that starting with: "Though I do now regret...

A. Yes. I said there starting in the third line: "Though I do now regret this oversight in not thinking to mention Abe's failure to regard to selection for the Laborers apprenticeship earlier in 2005."

Q. And you authored this e-mail to both parties, correct?

A. Yes, I did.

Q. All right. You attended an arbitration between the State and Laborers and the Public Employees Local 71 on July 19, 2005; do you remember that?

A. Yes.

Q. And this took place at the Department of Transportation in Fairbanks?

A. Yes.

Q. Was it your decision to attend that hearing?

A. Yes, it was my decision.

Q. D.O.T., this is your place of work?

A. Yes.

### Page 31

Q. In Fairbanks. Is that where your office is located, in that building?

A. Yes. And as you know, because you were there, I was there in the room at that arbitration for approximately 15 minutes.

Q. Yes. And what was your purpose in attending that hearing?

A. I was hoping to stay through the hearing to aid the D.O.T. in terms of evaluation and hearing the points being raised in the arbitration.

Q. Were you aware that the State was opposing a Laborers local at that time?

A. It was -- yes.

Q. Did you end up staying for the hearing?

A. No. There had been a miscommunication between one of witnesses and the A.G., the Assistant A.G. that was working with the case. He was not aware that I was coming and ended up wondering why. And after a discussion with the arbitrator, who was uncomfortable wondering what was going on, I offered and we agreed I would just exit.

Q. Okay. As an arbitrator, do you abide by the rules of ethics whether it's the AAA or the Revised Uniform Arbitration Act, do you abide those

### Page 32

rules regardless of whether they are spelled out by the parties prior to an arbitration hearing?

A. Yes, I do.

Q. Let's go back. I didn't make a lot of headway on that.

A. Exhibit 7, is that what you're saying?

Q. No. But do you think I need to ask more questions?

A. Yes, namely --

MR. JOHNSON: I'm going to object. She needs to frame the question.

BY MS. DRYGAS:

Q. I'm just going to ask you to go back to when your son Abraham had applied for the Laborers apprenticeship program in May of 2005. Would it be accurate to state that he had received his rejection letter from the Laborers prior to the beginning of the arbitration hearing between Steve Pope and AS&G which occurred on June 21, 2005?

A. Understood, but I don't remember.

MS. DRYGAS: Okay. I think we are done. Thank you.

MR. JOHNSON: I have a few follow ups.

EXAMINATION

BY MR. JOHNSON:

### Page 33

Q. Mr. Milne, I read your statements about you regret certain oversights as you describe it and so on. You don't know what the end result of what a court would determine as whether or not you really had to disclose this information, do you?

A. No, I don't.

Q. Is it fair to say that your regret runs to the inconvenience it's causing the parties?

A. That is correct. That's one of my strong reasons to come and offer a deposition even though I understand it is not always required. In fact, it's seldom required. I think the parities deserve the facts and by not thinking of it and not disclosing and not walking that walk, I have definitely inconvenienced the parties, which I definitely regret.

Q. So the inconvenience of the parties is through the legal process that we a going through to determine whether or not you had a non-disclosure problem here; isn't that what it's all about?

A. Yes. I don't know all the legal principles to be able to adequately gauge what the court will decide on the matter of non-disclosure.

Q. So let's say that the court were to

Page 34

conclude that what the Union suggests you should have disclosed is really so attenuated you didn't need to do that -- let's just assume that. That fact is even proving that is still an inconvenience to parties; isn't that right?

A. Yes.

Q. And you're regretful of causing that inconvenience whatever the outcome is that eventuates?

A. I am regretful of causing inconvenience to the parties like this.

Q. The issue of Abraham's lack of success in getting into the apprenticeship program was something that didn't -- you don't even recall when he got the notice the second time around in 2005?

A. Right. I know he has been working throughout, since before that circumstance, and it was just another alternative. I honestly I don't know when he got either of the two rejections. I'm confident the interviews are right in terms of the training lady.

Q. You don't know do you what relationship, if any, exists between the apprenticeship program of Laborers and a particular local of the Laborers, do you?

Page 35

A. I don't. I don't follow that.

Q. Do you think there is any relationship between the apprenticeship program and the local that might exist in Kentucky?

A. I don't know. I know our unions need capable Alaskan workers so I assume there is a connection between them, but I don't honestly know.

Q. Do you understand that there are a number of locals affiliated with the Laborers Union?

A. Yes. Hundreds, all over the country, yes.

Q. And is it your understanding that there is a local in Fairbanks, a separate local from the Local 341 in Anchorage?

A. Yes. That was my remembrance, my impression. I know the Carpenters have it split by parallel and I can't remember if the Laborers are a split local or not. I don't know.

Q. Now drawing your attention back to Exhibit 6, that long paragraph, the last full paragraph and there is a parenthetical where you talk about certain work you did in Anchorage; is that correct?

A. Yes.

Page 36

Q. Now, why would you bother to mention anything about Anchorage?

A. I mentioned here and as was mentioned earlier as we started the arbitration I mentioned again I had worked and worked with the Laborers Union and other unions in doing work for Peter Quate (ph) in Anchorage in the '70's and '80's. So I was alluding to that in here that I had been involved with the Laborers Union.

Q. So you saw a need, is it fair to say, there is a reason to recognize some issues that occurred in Anchorage as distinct as to maybe what occurred in Fairbanks?

A. The --

Q. Let me rephrase that question. It was a poorly phrased question. You're from Fairbanks and you had disclosed that you were familiar with Fairbanks issues; is that correct in this arbitration process?

A. I'm from Fairbanks and I'm definitely more familiar with Fairbanks than Anchorage, but I had worked in Anchorage and therefore surely was involved with the local that Mr. Pope was working for because he was in Anchorage.

Q. Back in the '70's and early '80's?

Page 37

A. Yes.

Q. So your testimony, as I understood it, is that you do not recall when you heard about Abraham's lack of success with the apprenticeship program in 2005?

A. Yes.

Q. And you did not know if you heard about his lack of success prior to or after June 29? You just don't have any recollection of it?

A. I don't remember. It's kind of consistent with the other point that I don't have it tagged in my mind because it never occurred to me and I don't remember. I would believe either way.

I don't remember -- it doesn't take two months after the interview to find out, but I don't know if it's one month and it happened or -- actually, anyway I don't remember.

Q. It wasn't material to your thought process?

A. No. It clearly wasn't because I will say again: I didn't choose. It never occurred Laborers-wise, Abe/me and, Gee, it would be a good idea to disclose that. It never came to mind. That's what I regret.