## Page 2

```
 1   IN THE UNITED STATES DISTRICT COURT FOR
 2      THE DISTRICT OF ALASKA AT ANCHORAGE
 3
 4   LABORERS LOCAL 341,
 5        Plaintiff,
 6   vs.
 7
     ANCHORAGE SAND AND GRAVEL
 8   COMPANY, INC.,
 9        Defendant.
     _____/
10   Case No. A05-250 CV (JWS)
11
12
13        DEPOSITION OF MICHAEL GALLAGHER,
14   taken on behalf of the defendant, pursuant to notice
15   at the offices of Wohlforth, Johnson, Brecht, Cartledge
16   & Brooking, Anchorage, Alaska, before Patta K. Johnson,
17   Shorthand Reporter for Alaska Stenotype Reporters and
18   Notary Public in and for the State of Alaska.
19
20
21
22
23
24
25
```

## Page 3

```
 1        APPEARANCES
 2
 3   For the Defendant:  WOHLFORTH, JOHNSON, BRECHT,
                         CARTLEDGE & BROOKING
 4                       By: Robert Johnson
                         900 West Fifth Avenue
 5                       Suite 600
                         Anchorage, Alaska 99501
 6                       907-276-6401
 7   For the Plaintiff:  GENERAL COUNSEL ALASKA STATE
                         DISTRICT COUNCIL OF LABORERS
 8                       By: Heidi Drygas
                         2501 Commercial Drive
 9                       Suite 140
                         Anchorage, Alaska 99501
10
11
12   Also Present:    Kevin Dougherty, General Council
                      Alaska District Council of Laborers
13
14
15
16
17
18
19
20
21
22
23   Reported By: Patta K. Johnson
24
25
```

## Page 4

```
 1
              I N D E X
 2
 3
     EXAMINATION BY:                            PAGE
 4
 5   Mr. Johnson                                5, 42
 6   Ms. Drygas                                 36
 7
 8
 9
10
11
     EXHIBITS:
12
     No exhibits were marked for identification.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1   Whereupon,
 2           MICHAEL GALLAGHER,
 3   called as a witness herein having been duly sworn
 4   upon oath by Patta K. Johnson, Notary Public, was
 5   examined and testified as follows:
 6           EXAMINATION
 7   BY MR. JOHNSON:
 8        Q.  For the record, would you state your name and
 9   spell your last name?
10        A.  Michael Gallagher, G- a- l- l- a- g- h- e- r.
11        Q.  Mr. Gallagher, how are you currently employed?
12        A.  I'm employed by Laborers Local 341, actually,
13   Laborers International Union of North America Local 341.
14        Q.  So if we shorthand it to Local 341, we will
15   agree that's the way we can refer to it?
16        A.  Yes.
17        Q.  In that regard, as an employee of Local 341,
18   are you employed by the International Union umbrella
19   organization for Local 341?
20        A.  The international union is our umbrella
21   organization that we belong to. I'm directly employed by
22   Labors Local 341. The members -- I'm an elected officer
23   and I'm elected every three years.
24        Q.  To serve in the role that you have with Local
25   341?
```

Page 6

1  A. Yes.
2  Q. Before we go into more questions, let's
3  clear this up for the reporter. If you could just
4  give her your phone number and address, please.
5  A. My address is 2501 Commercial Drive
6  Anchorage, Alaska 99501, and my phone 907-272-4571.
7  Q. Mr. Gallagher, with respect to Local
8  341, is there a geographical jurisdiction that
9  Local 341 has?
10 A. Yes, there is.
11 Q. What is it?
12 A. It's below the 63 rd parallel.
13 Q. So that is this side of Fairbanks?
14 A. Yes, it is.
15 Q. What is the nearest town to the
16 parallel?
17 A. If you were to take where the Tok
18 Highway is and pretty much draw a line across the
19 state, below that is approximately the 63rd
20 parallel.
21 Q. What about Southeast Alaska, is that
22 within Local 341?
23 A. Part of it is and part of it isn't.
24 Q. How many other locals are there in
25 Alaska?

Page 7

1  A. There are three labor local unions in
2  the state of Alaska and we all belong to the Alaska
3  State District Council of Laborers. And under that
4  umbrella Laborers Local 341, it's Laborers Local
5  942 out of Fairbanks and then there is Local 71.
6  Q. Is it Local 942 out of Fairbanks that
7  has a portion of Southeast Alaska as well?
8  A. Yes.
9  Q. Juneau?
10 A. Yes, they have Juneau.
11 Q. And Local 71 is a union that has to do
12 with public employees; is that correct?
13 A. Yes. All they handle is public
14 employees.
15 Q. You're not a employee of Local 942 or
16 Local 71?
17 A. No.
18 Q. What relationship do you have, if any,
19 with Locals 942 and 71?
20 A. To start with we belong to the same
21 international union. We belong to the same
22 district council of laborers and we meet about
23 three or four times a year to discuss issues that
24 are pertinent to each area.
25      Also, more with Labors Local 942 than

Page 8

1  the Local 71 is 942 and 341 we have our statewide
2  pension trust fund, our statewide health and
3  welfare fund and statewide training fund and
4  apprenticeship fund and a statewide Local fund.
5  Q. With the respect to the apprenticeship
6  fund is that a fund that provides the financial
7  support for the apprenticeship program?
8  A. Yes, it is.
9  Q. And describe for me -- or let's step
10 back for a second here. Are you familiar with the
11 litigation that is ongoing and this deposition is
12 part of and that is a challenge by Local 341
13 against an arbitration ruling rendered by Clark
14 Milne?
15 A. Yes, I am.
16 Q. And you understand Clark Milne's son
17 Abraham Milne applied for and was not accepted in
18 what is described as a Laborers apprenticeship
19 program in Fairbanks; is that your understanding?
20 A. Yes.
21 Q. And with respect to the apprenticeship
22 program in Fairbanks, who runs that? Does Local
23 341 run that program?
24 A. The apprenticeship program along with
25 our training fund, it's one entity. It is actually

Page 9

1  run by eight trustees, and from the eight trustees
2  two people are from Laborers 942, two people are
3  from Local 341 and I'm one of those trustees. And
4  then there is four management trustees, Darrel
5  Schoon with Unit Company; Ken Brady, with Ken Brady
6  Construction; Roxanne Horschel with Acme Fence; and
7  John Minder with Great Northwest.
8  Q. Does Local 314 contribute as a Local
9  monies to that apprenticeship program?
10 A. No.
11 Q. Does Local 942 contribute money to that
12 program?
13 A. No.
14 Q. Does Local 71 contribute to that
15 program?
16 A. No.
17 Q. So where does that program get its money
18 to operate?
19 A. The money comes in contributions from
20 employee contributions. Employee, employer
21 contributions into the fund. Hypothetically, when
22 we negotiate with our contractors, we allocate so
23 much money to go into the health and welfare, the
24 pension, the training and legal, and it's employee
25 contributions that go into those funds.

Page 10

1    Q. But the Local 341 ownership, if you
2 will, of the apprenticeship program, is limited to
3 two Local 341 officials being on a board of
4 trustees running that program; is that correct?
5    A. Yes.
6    Q. How many apprenticeship programs are
7 there for the Laborers, generally, in the state of
8 Alaska?
9    A. One.
10    Q. And that is run out of Fairbanks?
11    A. There is one apprenticeship program for
12 the Laborers in the state of Alaska and that's the
13 Alaska Laborers Apprenticeship Program which is
14 made up of Laborers Local 942 and Laborers Local
15 341.
16    Q. Now, young Abraham Milne applied for and
17 was not successful in getting into an
18 apprenticeship program; you're aware of that?
19    A. Yes, I'm am.
20    Q. He applied for Fairbanks?
21    A. Yes.
22    Q. Could he have applied in an
23 apprenticeship program in Anchorage if he had
24 wanted to?
25    A. Yes.

Page 11

1    Q. So there is an apprenticeship program in
2 Anchorage as well as in Fairbanks?
3    A. It's one program and what it is is where
4 a person geographically lives would be the
5 appropriate place for that person to apply. If he
6 wanted to, he could have applied here in Anchorage
7 or vice versa. If we have somebody here they can
8 apply in Fairbanks. As long as you're a resident
9 of the state for one year, you can apply in either
10 or.
11        Similar to people in Southeast. If you
12 are from Juneau because the Local handles that area
13 you would apply for Local 942. If you live in
14 Yakutat, you would apply through us and similar
15 with Kodiak, Valdez, the Kenai and other parts of
16 the state of Alaska.
17    Q. So when one applies -- in Abraham
18 Milne's situation he resides in Fairbanks and
19 applied to the Fairbanks apprenticeship program?
20    A. Yes.
21    Q. The way I'm describing it, is that an
22 accurate way of describing it?
23    A. He applied at the Alaska Laborers
24 apprenticeship program in Fairbanks, Alaska.
25    Q. And his training and so on would have

Page 12

1 taken place in Fairbanks then?
2    A. It would depend. We train people in
3 Fairbanks and we train them here. We probably have
4 more people coming from Fairbanks down to Anchorage
5 for training just because we have a bigger facility
6 here. We do send people from here to Fairbanks to
7 do training up there. We have two training
8 schools, Anchorage is the bigger site; Fairbanks is
9 a fairly new facility. It's only about five or six
10 years old.
11    Q. And other than the Anchorage and
12 Fairbanks facilities, there are no other
13 apprenticeship program facilities in the state of
14 Alaska?
15    A. No, we just have two facilities.
16    Q. Where would a Local 71 person apply for
17 an apprenticeship program or is that just not a way
18 of describing it?
19    A. Local 71 is not a contributor to the
20 Laborers training school, so they do not have a
21 training facility at all in the state of Alaska.
22    Q. Nevertheless, Local 71 is one of the
23 Locals of the Laborers Union in Alaska?
24    A. Yes.
25    Q. Didn't you say that Local 71 had a

Page 13

1 couple of the representatives on the Board of
2 Trustees for the apprenticeship program?
3    A. No, I didn't.
4    Q. Do you know how the apprenticeship
5 program works with respect to a person such as
6 young Abraham Milne applying for a job or position
7 with you?
8    A. Yes, I do.
9    Q. Could you describe for me and for
10 whoever is going to read the transcript of this
11 deposition how it goes about, how it takes place?
12    A. A person applies, they get an
13 application from our training school; they fill
14 that out and with all the supporting documents,
15 they turn that in. After they turn that in, we
16 schedule interviews for anyone that has applied
17 during a certain time period. And we have three
18 people that interview the participant. We get a
19 management person, we get somebody from the local
20 union and we get our training director or his
21 designee that sits in on all of the interviews and
22 we rank them on different aspects of what we were
23 questioning.
24        We ask everybody the same questions.
25 Each individual person ranks them, 1 through 10, on

EXHIBIT 4 (Pages 10 to 13)
B
3 of 12
Alaska Stenotype Reporters

Page 14

1  different aspects of the interview. After all the
2  interviews are completed, they are -- the scores
3  are tallied and you come up with a common score.
4  You divide them by three and come up with an
5  average score and that person is ranked at that
6  time.
7       There is a lot of misconception about
8  how an apprenticeship picks people that are going
9  to be put into the program. A lot of people think
10 it is the business manager, such as myself, or one
11 of the agents that determine who puts them in
12 there, but that is not how that works.
13      Q. So there is an interview process. Is
14 there then a test that is administered?
15      A. There are times that we will give a math
16 test just to see where a person places with math,
17 but other than that that is only the requirement.
18      Q. How do you tell somebody that they have
19 been either successful or unsuccessful in passing
20 through this process you have just described?
21      A. Hypothetically, if we interview a
22 hundred people and we take a look at work, what the
23 work situation is going to be and we say we decide
24 we are going to select 20 to 25 people, what we
25 would do is we would take the top 20, 25 scores and

Page 15

1  as work becomes available, we would start with the
2  person with highest score and just work our way
3  down.
4       Being in the construction industry, it's
5  real difficult to say we are going to take exactly
6  20 people or we are going to take exactly 50
7  people. It just depends on the type of work that
8  our contractors are dealing with and so it just
9  varies. We have had to open our apprenticeship up
10 several times, and we do that in a season.
11 Sometimes we open the apprenticeship up two times
12 and sometimes we have had to open it up three
13 times.
14      Q. I don't think I understand what you mean
15 by "open up" the apprenticeship program?
16      A. The program, under the federal
17 guidelines with the Bureau of Apprenticeship, we
18 have to -- when we applied for our standard for
19 our apprenticeship program, you have certain
20 openings that we tell the federal apprenticeship
21 group we are going to open our apprenticeship,
22 whether we are going open up in the winter or
23 spring or fall or go to a continuous opening to
24 give us the latitude. Sometimes we look into the
25 crystal ball and we misjudge the amount of

Page 16

1  construction work that is going to start. A
2  project we are not aware of can come up and we may
3  need more people than we anticipated. When that
4  happens, we will open our apprenticeship more than
5  one time in a year.
6       Q. So by opening it up it's an invitation
7  to folks that want to apply for it, is that what
8  you mean by opening?
9       A. Yes.
10      Q. It's an announcement, an invitation to
11 come and apply?
12      A. Yes. We have to do certain advertising
13 requirements to meet the guidelines that we are
14 reaching out and giving public notice, that we are
15 opening up our apprenticeship program.
16      Q. How many openings, as you describe it,
17 occurred at least for the apprenticeship program in
18 Fairbanks in 2004 and then in 2005?
19      A. In Fairbanks? I'm just guessing. I
20 can't even tell you how many times we did it in
21 Anchorage and I oversee a lot of that. I would say
22 probably four times.
23      Q. In each of those years?
24      A. Together. Probably two or three times a
25 year is what we have been averaging in the last

Page 17

1  three years.
2       Q. Now, young Mr. Milne applied and was
3  unsuccessful once in 2004 and 2005 again. Do you
4  recall that; is that your understanding?
5       A. That is my understanding, yes.
6       Q. Do you have any idea how many applicants
7  there were for those apprenticeship programs at the
8  openings where he applied and was unsuccessful?
9       A. No, I don't.
10      Q. Was it more than ten people?
11      A. I would think so, yes.
12      Q. Are we talking hundreds of people?
13      A. I would say, and this is just a guess,
14 but between Anchorage and Fairbanks we usually have
15 anywhere from 50 to 100 people, approximately, that
16 apply for each opening.
17      Q. And of that 100 to 150 that apply at
18 each opening, what is the typical acceptance ratio?
19 You described 20 to 30; is that about correct?
20      A. I would have to look. I used to be real
21 involved in all the interviews. The last couple
22 years I have not been involved in it. So I don't
23 know the exact number.
24      Q. Do have you an estimate?
25      A. Last year, I don't know totally. I can

Page 18

1  give you a ball park figure. Some of them are
2  first-year apprentices, some of them are second
3  year, some of them are third year, but we have
4  about 90 to 100 people in the program. And each
5  year we probably take in, and this is just a
6  guesstimate, probably 20 to 30, 40 people.
7      Q.  So based on your experience, is it fair
8  to say it sounds like 30 percent of the applicants
9  are accepted into the program in recent times?
10     A.  It really depends on the people that are
11 doing the interviews and it depends on the
12 workload. It depends on the quality of the
13 applicants that are coming in. There are several
14 variables that we look at as an organization of
15 what we want to bring in.
16     Q.  Who would the person or what would be
17 the source that I would best go to to get that
18 information for 2004, 2005?
19     A.  To get the exact numbers would be Les
20 Louinger. Les Louinger is the training director for
21 Alaska Laborers Training Fund and the
22 apprenticeship program.
23     Q.  Now is Les Louinger, he is not an
24 employee of Local 341?
25     A.  No, he is not.

Page 19

1      Q.  He is an employee of that particular
2  program alone; is that correct?
3      A.  He is an employee of the Laborers
4  training school and apprenticeship program. He is
5  a member of Laborers Local 341.
6      Q.  When a person is accepted the into the
7  apprenticeship program after going through the
8  process that you've described, does that person
9  then go through classes, through a training period
10 or sent out to a job site?
11     A.  When a person is selected, we like to
12 give them a couple of weeks minimum training. That
13 doesn't always happen, but that is what we try to
14 do. So rule of thumb they would get at least two
15 weeks of training and we would place them in a job
16 with a contractor and then every year they have
17 to -- I believe, the number they have is 144 hours
18 of additional training every year.
19     Q.  Now, Mr. Gallagher, you attended the
20 arbitration that is at issue in this matter; did
21 you not?
22     A.  Yes, I did.
23     Q.  June 29, 2005, does that sound about
24 right?
25     A.  It sounds about approximately, yes.

Page 20

1      Q.  At that particular proceeding, did you
2  detect any animosity toward the Union from Mr.
3  Milne the arbitrator?
4      A.  No, I didn't.
5      Q.  At the time of the proceeding, did you
6  know at that time he had a son that applied to the
7  apprenticeship program?
8      A.  No, I didn't.
9      Q.  Why didn't you?
10     A.  I didn't know.
11     Q.  Well, isn't there a connection between
12 the apprenticeship program and Local 341?
13     A.  Between Laborers Local 341 and Laborers
14 Local 942, between us we have about 3300 members
15 and I don't know all the apprentices that belong to
16 Laborers Local 341. I don't deal with every single
17 individual person. I would never have that much
18 time on my hands.
19     Q.  In this proceeding you filed an
20 affidavit; do you recall doing that?
21     A.  Yes, I do.
22     Q.  In that you made this statement --
23     MS. DRYGAS:  Which?
24     MR. JOHNSON:  In the affidavit of
25 Michael Gallagher. I don't propose to introduce it

Page 21

1  necessarily but I can do if you like.
2  BY MR. JOHNSON:
3      Q.  You make the statement: "On or about
4  July 11, 2005, I learned from Dan Simonian, the
5  president and business agent of Local 942 in
6  Fairbanks that the arbitrator's son Abraham Milne,
7  failed to be selected for enrollment by the Alaska
8  Laborers Training Trust Apprenticeship Program on
9  two separate occasions." Do you recall making that
10 statement in your affidavit?
11     A.  Yes, I do.
12     Q.  Was that a truthful statement?
13     A.  Yes.
14     Q.  Why did Dan Simonian mention to you that
15 the arbitrator's son, Abraham Milne, failed to be
16 selected?
17     A.  I can't remember exact word-for-word,
18 but in essence, we were discussing an arbitration
19 that we had and I told him we lost the arbitration.
20     Q.  When you were referring to the
21 arbitration, you're talking about the Steve Pope
22 arbitration that Mr. Milne --
23     A.  Yes. And he asked me who the arbitrator
24 was and I told him and he says, Well, were you
25 aware his son has applied twice for the Laborers

EXHIBIT 6 (Pages 18 to 21)
B
5 of 12
Alaska Stenotype Reporters

### Page 22

1  apprenticeship program and I said, no. And he
2  hasn't been selected either time.
3        And when the morning of our arbitration
4  with Mr. Pope, the arbitrator -- one of the first
5  things he said was that he had no conflicts; didn't
6  know the laborers, didn't know Anchorage Sand,
7  didn't know any of the parties. And I recall when
8  Kevin Dougherty from my general counsel -- I was on
9  vacation when he got the arbitrator's ruling. Mr.
10 Dougherty told me that we lost of arbitration they
11 ruled if favor the Anchorage Sand and Gravel. And
12 I said, Kevin, do me a favor call Steve Pope and
13 let him know and let him know that it was over.
14       This is the first time in our history we
15 have ever challenged an arbitrator. We believe in
16 the process very strongly but when we found out
17 that the arbitrator's son had not been selected two
18 times from the Laborers apprenticeship program I
19 felt there was a conflict of interest.
20       I'm a parent just like anybody else.
21 We, as parents, are very protective of our kids and
22 I believe that -- I believe he should have told us
23 about that potential conflict and I believe it is a
24 conflict.
25    Q. Let's say the arbitrator's decision

### Page 23

1  would have gone the opposite direction held in
2  favor of the Union and favor of Mr. Pope and this
3  information came to your attention, what would you
4  have done?
5     A. I don't know. But it was like when we
6  were picking an arbitrator, during that process my
7  attorney Mr. Dougherty I asked him to go through a
8  process for me and I believe we had it down to two
9  arbitrators and Kevin Dougherty told me, my
10 counsel, who the names were. And I do know I
11 implied to him right away one the arbitrators, I
12 can't even think of his name right now, but I told
13 him that that arbitrator has done work for us and I
14 said make sure that the other party is aware that
15 he has worked for us.
16    Q. But you're not referring to Mr. Milne
17 are you?
18    A. No. I think it was Mr. Bledsoe or
19 something like that.
20    Q. Did you direct your counsel or yourself
21 to undertake an inquiry of Local 942 or the
22 apprenticeship program or did you undertake any
23 inquiry of them as to whether they had any
24 knowledge about Mr. Milne?
25    A. Could you repeat that, please.

### Page 24

1     Q. When you heard that Mr. Milne and Mr.
2  Bledsoe were being considered as arbitrators, did
3  you run their names by officials of Local 942?
4     A. No, I didn't.
5     Q. Did you run their names by
6  representatives of the apprenticeship program?
7     A. No, I didn't.
8     Q. Did you run them by the officials of
9  Local 71?
10    A. I did not, no.
11    Q. Did you direct anybody to run those
12 names by any of Local 71 or 942 or the
13 apprenticeship program?
14    A. I never directed my counsel, but I do
15 believe my counsel talked to somebody from Local
16 71.
17    Q. But your understanding is nobody talked
18 to anybody from 942 or from the apprenticeship
19 program?
20    A. Well, let me take that back. Our
21 apprenticeship director -- I believe I had
22 conversations with him about this arbitration. So
23 let me restate what I said.
24    Q. You had conversations with him prior
25 about who the arbitrator was?

### Page 25

1     A. We had discussions, but exactly what we
2  discussed, I'm not sure. I know I had discussions
3  with our training director out there about taking
4  it to arbitration. And exactly the details, I
5  can't recall.
6     Q. Well, Mr. Gallagher, you think there is
7  a conflict by Mr. Milne's failure to disclose
8  information as it related to the matter involving
9  Local 341. But Mr. Milne's son was involved in at
10 most with 942 or with the apprenticeship program;
11 is that fair to say?
12    A. I, as a trustee, set a lot of the rules
13 and policies along with several other trustees.
14 I'm a trustee on the Alaska Labor apprenticeship
15 program.
16    Q. Didn't you then have a trust obligation
17 to inquire about Mr. Milne's status with Local 942
18 with the apprenticeship program before you picked
19 him?
20    A. No, I didn't.
21    Q. Then what is the conflict? If you see a
22 conflict now, why didn't you check it out before
23 Mr. Milne was picked and went through the
24 arbitration?
25    A. It never dawned on me to call 942 or

Page 26

1  check with our apprenticeship program. It never
2  came to my -- I never even -- it never even popped
3  into my mind. I rely on my general counsel to do a
4  lot of this work for me, and I believe that if a
5  person has a conflict, like I believe the
6  arbitrator did, and Mr. Johnson you were there that
7  morning when the arbitrator said he had no
8  conflicts and no dealings with anybody in either of
9  the parties. And I -- whether he did intentionally
10 or not, I have no idea but --
11     Q.  What party --
12     A.  Can I finish?
13     Q.  I'm sorry. I didn't mean to interrupt
14 you, sir.
15     A.  When he told us he had no dealings with
16 any of us, if the arbiter would have told me that
17 his son had applied for Alaska Laborers
18 apprenticeship and has not been picked, not once
19 but twice, I would have raised a major conflict
20 because I'm a parent. I know how protective I am
21 of my children. That's just a parent, we are very
22 protective of our siblings (sic).
23     Q.  Mr. Gallagher, I do apologize for
24 interrupting you, but at the arbitration proceeding
25 do you remember Mr. Milne's saying that he had no

Page 27

1  conflict with Local 942? That he no conflict with
2  the apprenticeship program; do you remember him
3  saying that?
4      A.  No, I don't know.
5      Q.  Do you remember him saying he had no
6  conflict with Local 341?
7      A.  Yes.
8      Q.  So you take the conclusion that the
9  alleged relationship with 942 and the
10 apprenticeship program is a critical issue in terms
11 of his ability to sit on a matter involving Local
12 341, why didn't you undertake an inquiry of 942 or
13 the apprenticeship program to find out if there was
14 some conflict?
15     A.  I did not do it. I don't know why.
16     Q.  Did you instruct anybody to do it?
17     A.  I don't believe I did.
18     Q.  When did you first hear that Clark Milne
19 was being considered as a possible candidate for an
20 arbitrator position in this matter?
21     A.  What is the question?
22     Q.  When did you first hear of Clark Milne
23 as a possible arbitrator in the Steve Pope matter?
24     A.  I'm not sure. It was a week or before,
25 approximately, of the arbitration. I left that up

Page 28

1  to my general counsel to pick the arbitrator.
2      Q.  I'm going to show you what was marked as
3  Exhibit 1 in the deposition of Mr. Milne. Have you
4  seen that letter dated June 6, 2005?
5      A.  I don't recall. I very -- I may have,
6  yes. Do I recall it, no.
7      Q.  Were you involved in the decision, in
8  fact, to select Mr. Milne as distinct from Mr.
9  Bledsoe or anyone else?
10     A.  I left it up to my general counsel.
11     Q.  I don't want to invade your
12 attorney/client privilege, but did you talk about
13 the subject of who ought to be selected with your
14 general counsel?
15     A.  I had discussions with my general
16 counsel, yes.
17     Q.  Did you offer input as to whether Mr.
18 Milne was an appropriate candidate or not?
19     A.  I just told him to pick somebody that
20 was fair.
21     Q.  Do you have any knowledge as to why
22 Abraham Milne was not selected to the
23 apprenticeship program in 2004, 2005?
24     A.  No, I don't.
25     Q.  Have you asked anybody about it?

Page 29

1      A.  I have heard. I have -- I have asked
2  why he was not rated high. Yes, I did ask that
3  question.
4      Q.  What did you hear as a response to that
5  question?
6      A.  You know it's been about five, six,
7  seven months now. One reason, I believe, is that
8  he was a little slow.
9      Q.  Slow in terms of mental capacity; is
10 that what you're referring to?
11     A.  I'm not sure what they were referring
12 to, whether it was mental or physical. I don't
13 know. What it is is that it wasn't -- it was a
14 selection process based on average scores and his
15 score was not as high as the other applicants.
16     Q.  Is that a fairly routine occurrence that
17 folks are let go or not selected because their
18 score is not as high as the average?
19     A.  Well, if you have -- hypothetically, if
20 you have 50 people applying for the apprenticeship
21 program and you're going to take in 20 people, the
22 top 20 people with scores would be the ones that
23 you would pick. The other 30 -- and sometimes it's
24 a real close call.
25         Sometimes I wish had more positions

Page 30

1  available because you had some good candidates, but
2  sometimes it's just the way a person interviews,
3  their knowledge of the industry, attitude.
4      Q.  Do you recall any discussions with
5  anybody whether young Mr. Milne was close in
6  meeting the cut or was he significantly under the
7  average mark of those that were accepted?
8      A.  Don't me hold me to this because it's
9  been six, seven, eight months since we have had
10 this discussion, but I believe they really wanted
11 to pick him as an apprentice, from what I gathered,
12 because he not only applied once but twice.  So he
13 was showing a lot of interest in wanting to be part
14 of the Laborers apprenticeship program.  But they
15 just didn't -- they just didn't get it done.
16     Q.  Did young Mr. Milne appeal or protest
17 the decisions at all to your knowledge?
18     A.  Not to my knowledge.
19     Q.  Is there a process to do that if one
20 wanted to do that?
21     A.  We have more appeals -- yes, we do have
22 a process.
23     Q.  But he did not appeal?
24     A.  Not to my knowledge, no.
25     Q.  To your knowledge, did his father Clark

Page 31

1  Milne make any kind of an issue with anybody about
2  it?
3      A.  Just third -- just second-handed.  Tim
4  Sharp, my counterpart in Fairbanks, indicated that
5  he had a conversation with Mr. Milne.  I don't know
6  all the details of that conversation.
7      Q.  Was it your understanding that that
8  conversation was reflected in the affidavit that
9  Mr. Sharp provided in this litigation?
10     A.  I believe so.
11     Q.  About how long does it take, if you
12 know, between when a person is interviewed for the
13 apprenticeship program and told whether they have
14 been accepted or not?
15     A.  It varies.
16     Q.  You don't have any knowledge about that,
17 at least in 2005 if the representation is accurate,
18 that Abraham Milne interviewed in May of 2005 for
19 the Laborers apprenticeship program in Fairbanks?
20 You don't know when the rejection notices or
21 acceptance notices went out?
22     A.  No, I don't.
23     Q.  Now, Local 341 enters into a collective
24 bargaining agreement with employers as Local 341;
25 is that correct?

Page 32

1      A.  No.  Yes and no.
2      Q.  I'm going to hand you what was marked as
3  Exhibit 2 to the Clark Milne's deposition.  Have
4  you seen that before?
5      A.  I believe so, yes.
6      Q.  Is this a Plant Agreement between
7  Laborers International Union of North America
8  AFL-CIO Alaska District State Council Laborers
9  Local 341 and AS&G?
10     A.  Yes, it is.
11     Q.  So this is a CBA, collective bargaining
12 agreement between Local 341 and AS&G; is that
13 right?  Is that what it is?
14     A.  The Alaska State District Council of
15 Laborers' Local 341.
16     Q.  Is that the full name for Laborers Local
17 341?
18     A.  We use different things under our Alaska
19 State District Counsel of Laborers, which I
20 indicated earlier is made up of three locals up
21 here; Local 942 and Local 71 and Local 341.  And we
22 use the district council's name at times like our
23 master agreement this here agreement, because it is
24 specific to our geographical area; it is negotiated
25 by Laborers Local 341.  Our master agreement is

Page 33

1  negotiated with Local 942 and Local 341 because
2  that is a statewide agreement similar to our
3  training trust, our pension, health and welfare.
4      Q.  So while there may be a statewide
5  agreement, the one with 341 and AS&G was a local
6  agreement; is that correct?
7      A.  Yes, sir.
8      Q.  And this agreement is not between Local
9  942 and AS&G, is it?
10     A.  No, it's not.
11     Q.  And it's not between the Laborers
12 apprenticeship program and AS&G, is it?
13     A.  Yes, it is.
14     Q.  This is between the apprenticeship
15 program and AS&G?
16     A.  Anchorage Sand and Gravel contributes to
17 our apprenticeship training program.
18     Q.  While it may have an obligations even
19 under this collective bargaining agreement to
20 contribute, is this agreement actually between the
21 apprenticeship program and AS&G?
22     A.  The fringe benefits; the negotiated wage
23 that we negotiate with Anchorage Sand and Gravel.
24 Every year we go out to the membership and we ask
25 them what they want to put into the Alaska Laborers

EXHIBIT 9 (Pages 30 to 33)
B
8 of 12
Alaska Stenotype Reporters

Page 34

1   Pension Plan, Alaska Laborers Medical Plan, Alaska
2   Laborers Training Plan and Alaska Laborers Legal
3   Plan.
4        At that time those monies are then,
5   whatever we decide on what we want as contribution
6   rates to those specific plans, the contractor pays
7   into the those plans and part of that negotiated
8   wage is part of the Alaska Laborers training
9   school.
10       Q.  But in reaching that agreement, in
11  reaching an agreed upon contribution rate, that was
12  part of the collective bargaining agreement that we
13  are talking here, that has been marked as Exhibit
14  2, between Local 341 and AS&G?
15       A.  Yes.
16       Q.  The dispute that was actually being
17  arbitrated by Mr. Milne involved the termination of
18  an employee represented by Local 341, correct?
19       A.  Yes.  We are the agencies that
20  represented Mr. Pope in his arbitration, yes.
21       Q.  Local 942 didn't represent Mr. Pope?
22       A.  No.  But Kevin Dougherty actually was
23  our general counsel that works for Alaska State
24  District Council of Laborers Local 341, Laborers
25  Local 942 and Laborers Local 71.

Page 35

1        Q.  And given that Mr. Dougherty is in that
2   position, would he then have access to ask
3   questions as far as you know of Local 942 or the
4   apprenticeship program regarding information they
5   might have about a variety of issues?
6        A.  I believe he would, yes.
7        Q.  So do have you any knowledge of whether
8   Mr. Dougherty in his capacity as general counsel
9   for the District Council of Laborers in fact
10  inquired of Mr. Milne's alleged conflict status
11  with 942 or the apprenticeship program?
12       A.  The only person that I recollect that
13  Mr. Dougherty talked to was Jim Astin with Local
14  71.  That's because -- and probably the reason is,
15  and I have would have ask Mr. Dougherty, is Local
16  71 does a lot the arbitrations.  Their agents are
17  trained to do arbitrations.  Whereas, Local 942 and
18  341 we rely solely on Mr. Dougherty, at that time
19  to do our arbitration.  Mr. Dougherty has helped
20  and done arbitrations for Locals 71, but he
21  exclusively does all of ours for 341 and 942.
22       Q.  From these various sources, Local 71,
23  Local 942, the apprenticeship program and Local
24  341, nobody came up with any information, if you
25  will the Union side of the situation, about Mr.

Page 36

1   Milne's relationship with an applicant to the
2   apprenticeship program?
3        A.  Not to my knowledge.
4        MR. JOHNSON:  Thank you, Mr. Gallagher,
5   I don't have any further questions for you.
6        EXAMINATION
7   BY MS. DRYGAS:
8        Q.  If I could just take one minute.  Mr.
9   Gallagher, I want to revisit something briefly that
10  Mr. Johnson discussed.  Les Louinger, can you
11  explain his position with the training program?
12       A.  Les Louinger is director of the Alaska
13  Laborers Training School and Alaska Laborers
14  apprenticeship program and he answers directly to
15  myself and the other trustees.
16       Q.  Okay.  So he oversees the programs that
17  are in Anchorage and Fairbanks?  He is the director
18  of those programs?
19       A.  Yes.
20       Q.  And because I think there was a little
21  bit confusion, as for the trustees that are members
22  of the Laborers Union, can you tell me who those
23  trustees are?
24       A.  There's two trustees from Fairbanks.
25  One of the trustees is Tim sharp.  He is the

Page 37

1   business manager, secretary-treasurer of Local 942.
2   Dan Simonian is the president of Local 942.  In
3   Anchorage, Ron McFeeeders is the trustee and vice
4   president of Laborers Local 341.  And, myself, Mike
5   Gallagher, businesses manager, secretary-treasurer
6   of Laborers Local 341.
7        Q.  You mentioned a name who was placed in a
8   list of our potential arbitrators for this
9   discussion, Bledsoe.  Would that be Mark Bledsoe?
10       A.  I believe that is name.
11       Q.  Why did you feel there was a conflict;
12  can you state that again?
13       A.  Approximately five, six --
14  approximately, it may have a been little longer or
15  little less, through our trust fund Mr. Bledsoe
16  represented all of our trust funds in that our
17  normal attorney which is Randy Simpson with Jermain
18  Dunnagan and Owens was conflicted out and we had to
19  get outside counsel on a collection matter.
20       We had a contractor that wasn't paying
21  their contributions to the pension, health and
22  welfare, training and legal funds.  We had to go
23  out and get counsel and Mark represented us at that
24  time, Mr. Bledsoe did, I believe it was.  And when
25  I heard that name, I disclosed it to my general

Page 38

1  counsel Kevin Dougherty.
2    Q.  And he represented the trust fund on
3  matter and that trust fund is paid into by both 942
4  and members of 942 and 341 and the employers?
5    A.  Yes.
6    Q.  Do you recall to your knowledge did Mr.
7  Dougherty contact Mr. Johnson, counsel for
8  Anchorage Sand and Gravel to let them know?
9    A.  I believe Mr. Dougherty did. I
10 requested that he let Counsel on the other side
11 know.
12   Q.  When you learned about the arbitrator
13 Clark Milne's son being rejected from the Laborers
14 Apprenticeship Program, did you confront AS&G,
15 Anchorage Sand and Gravel, with that information?
16   A.  Yes, I did.
17   Q.  Who at AS&G did you give that
18 information to?
19   A.  I believe I talked to Mr. Dale Morman and
20 Mr. Steve Lovs, I think. I believe we had sit-down
21 meeting. I called them and talked to them on the
22 phone and, I believe, I asked for a meeting.
23 I told them I just became aware of an issue and I
24 wanted to sit down and discuss with, I believe, it
25 was Mr. Morman for sure Mr. Lovs may have been

Page 39

1  there.
2      We discussed the issue about when I
3  found out that the arbitrator's son had not been
4  picked, not once but twice, for the Laborers
5  apprenticeship and that the arbitrator did not
6  disclose his ties with the his family members
7  through Alaska Laborers apprenticeship program. I
8  was very concerned about him not mentioning a
9  conflict, which I believe is accurate.
10   Q.  Mr. Morman and Mr. Lovs, what are
11 their positions with AS&G?
12   A.  Their exact titles, I'm not sure.
13   Q.  Best estimate?
14   A.  Mr. Morman is head of anchorage Sand
15 and Gravel and Mr. Lovs is one of the
16 superintendents and general managers there.
17   Q.  Okay. When you confronted them, how did
18 they respond to that information, Mr. Morman and Mr.
19 Lovs?
20   A.  The conversation that we had, Mr.
21 Morman took it very serious. He said let me do some
22 research. He did. He got back to me a week
23 or two later, whatever that was, maybe three weeks
24 later, and indicated to me that he didn't think
25 that it was a conflict of interest and that he had

Page 40

1  no desire at this time to -- Mike's recommendation
2  was to just pick another arbitrator and
3  re-arbitrate it.
4      And like I said earlier, this is the
5  first time in our history. And even though we
6  don't do a lot of arbitrations, we have done our
7  fair share over the 30 years I have been involved.
8  This is first time this has ever happened that we
9  found out that there was, we believe, a conflict.
10   Q.  And you said you have been with the
11 Local for how many years?
12   A.  Almost 31 years.
13   Q.  Okay. Mr. Gallagher, do you believe
14 that it was the arbitrator's duty and not your duty
15 or the Local's duty to discover or disclose this
16 type of information about Abraham Milne?
17   A.  I believe it's the arbitrator's duty to
18 disclose any conflict just like he did that morning
19 at the outset of our arbitration. He indicated
20 that there was no conflicts between the parties and
21 he had no dealings with them and in, like, I'm
22 saying it -- he may not have recognized it.
23     I don't know that. But he may have
24 forget to mention it that morning, I don't know.
25 He seems like a very honest person. But when I

Page 41

1  found out that his son was not picked for the
2  apprenticeship, not once but twice -- I'm a parent
3  just like any other parent. I'm a very protective
4  person with my children, and I believe most people
5  are.
6    Q.  Let me think how to phrase this. It is
7  your opinion that the onus was not upon you to
8  research whether the arbitrator had a son, whether
9  he had applied as one of the many applicants of
10 apprenticeship program? Do you believe -- is it
11 your opinion that that onus was not upon you to
12 discover that type of information?
13   A.  I believe, if I would have been the
14 arbitrator, I would have disclosed if my son had a
15 relationship with one of the parties.
16   Q.  Do you believe it was your duty to
17 discover that information?
18   A.  No, I don't. I believe that it was the
19 arbitrator's duty to disclose the conflict. And
20 then it was up to the two parties to decide whether
21 or not they felt it was a conflict.
22   Q.  If you had been aware of the fact that
23 arbitrator's son, Abraham, had been rejected from
24 the Laborers apprenticeship program, would you have
25 agreed to the selection of Clark Milne as your

Page 42

```
 1  arbitrator?
 2      A.  No, I would not have.
 3          MS. DRYGAS:  That's all I have.
 4              EXAMINATION
 5  BY MR. JOHNSON:
 6      Q.  Just a follow up.  Mr. Gallagher, you
 7  indicated you had a sit-down conversation with at
 8  least Dale Morman or Steve Lovs.  Did either or
 9  both of those folks ask you a series of questions
10  to provide them further information by way of
11  verifying what you were suggesting?  Do you
12  remember any kind of a list of questions either
13  being presented to you orally or in writing?
14      A.  I believe, there was something, yes.  I
15  don't know if it was orally or if he gave me the
16  questions written.  It could have been either one
17  of them.  I do remember getting back with him with
18  some of the information, yes.
19      Q.  Do you remember what information you
20  provided him at that time?
21      A.  I would have to research it.  I have a
22  file at my office, I could tell you what I told him
23  or what I sent him.
24      Q.  Do you have a recollection of providing
25  him some written information?
```

EXHIBIT B
11 of 12

```
 1          A.   I believe, I did.  I believe it was --
 2   it may have been -- I would have to research my
 3   records so don't hold me to this, but I believe it
 4   was information from our training director, Mr.
 5   Louinger, stating that his son, the arbitrator's
 6   son, had applied in 2004-2005 for the
 7   apprenticeship program.
 8          MR. JOHNSON:  Thank you.  That's all my
 9   questions.
10          (Proceedings concluded at 4:15 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```