UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| LABORERS LOCAL 341, ) | |
| ) | |
| Plaintiff, ) | 3:05-cv-250 JWS |
| ) | |
| vs. ) | ORDER FROM CHAMBERS |
| ) | |
| ANCHORAGE SAND & GRAVEL CO., ) INC., ) | [Re: Motions at Dockets 13 & 20] |
| ) | |
| Defendant. ) | |
| ) | |

## I. MOTIONS PRESENTED

At dockets 13 and 20, Laborers Local 341 ("Local 341") and Anchorage Sand & Gravel Co., Inc., ("ASGC") have filed cross-motions for summary judgment on Local 341's complaint. The motions have been fully briefed. Oral argument was heard on Friday, June 9, 2006.

## II. BACKGROUND

This case is about an arbitrator's failure to disclose a fact. The fact was his son applied to the Alaska Laborers Training Trust Apprenticeship Program and was rejected. That fact's importance depends on the closeness of the connection between Local 341 and the apprenticeship program.

Local 341 is one of three separate, Alaskan locals of the Laborers International Union of North America.[1] The two other locals are Local 942 and Local 71.[2] Together, the three locals comprise the Alaska State District Council of Laborers.[3] Local 71 has no connection to the apprenticeship program and so will not be discussed further.[4] Local 341's jurisdiction extends south of the 63rd parallel, including Anchorage and portions of Southeast Alaska.[5] Local 942's jurisdiction stretches north of the 63rd parallel, including Fairbanks, and also covers the areas in Southeast Alaska not under Local 341's jurisdiction.[6]

Locals 341 and 942 have separate officers, but they share common pension, health and welfare, training, and apprenticeship funds.[7] The money for those funds does not come directly from the locals, but instead derives from payments made pursuant to contracts negotiated between the locals and contractors. For example, the collective bargaining agreement ("CBA") between Local 341 and ASGC provides that a portion of the compensation ASGC pays to its employees will be set aside for the locals' funds.[8]

The money in those funds is spent on, among other things, the Alaska Laborers Training School and Alaska Laborers Training Trust Apprenticeship Program.[9] The record does not indicate whether the training school and apprenticeship program are organized under state or federal law as independent corporations, joint ventures, or

---

[1]Doc. 24, ex. B, deposition of Michael Gallagher, p. 5 ll. 12-13, p. 7 ll. 1-5.

[2]*Id.*, ex. B, p. 7 ll. 1-5.

[3]*Id.*, ex. B., p. 7 ll. 1-3.

[4]*Id.*, ex. B, p. 12 ll. 19-21, p. 13 l. 3.

[5]*Id.*, ex. B, p. 6 ll. 7-23.

[6]*Id.*, ex. B, p. 6 ll. 7-23, p. 7 ll. 6-10.

[7]*Id.*, ex. B, p. 7 ll. 15-25, p. 8 ll. 1-4.

[8]*Id.*, ex. C, affidavit of Steve Lovs, pp. 2-3 ¶ 4; ex. A, p. 15.

[9]*Id.*, ex. B, p. 8 l. 8, p. 34 ll. 4-9.

other familiar business organizations. The only label applied to them in the record is, in the words of Local 341 officer Michael Gallagher, "[t]he apprenticeship program along with our training fund, it's one entity."[10]

While the record lacks a clear characterization of the training school and apprenticeship program, it does contain a fairly thorough description of their structure and purpose. They are directed by Leslie Louinger, who is a member of Local 341 but an employee of the training school and not the local.[11] Louinger reports to an eight-member board of trustees, whose membership is split equally between management and union representatives.[12] Of the four management representatives, none is from ASGC.[13] Of the four union representatives, two are Local 341 officers and two are Local 942 officers.[14] The union representatives involved in this case include Gallagher, Local 341's business manager and treasury secretary, Tim Sharp, Local 942's business manager and treasury secretary, and Dan Simien, Local 942's president and business agent.[15]

The apprenticeship program runs two schools, one in Fairbanks and the other in Anchorage, and applicants may apply to either school.[16] Applicants are interviewed by three people, one each from management, the unions, and Louinger's office.[17] They are ranked on a scale of one to ten and offers of placement in the program are extended to applicants who receive the highest average scores.[18] The number of

---

[10]*Id.*, ex. B, p. 8 ll. 24-25.

[11]*Id.*, ex. B, p. 18 ll. 24-25, p. 19 ll. 3-5, p. 36 ll. 12-19.

[12]*Id.*, ex. B, p. 9 ll. 1-7.

[13]*Id.*

[14]*Id.*

[15]Doc. 14, ex. B, C, H.

[16]Doc. 24, ex. B, p. 11 ll. 3-10, p. 12 ll. 2-10.

[17]*Id.*, ex. B, p. 13 ll. 12-23.

[18]*Id.*, ex. B, p. 13 ll. 24-25, p. 14 ll. 1-6, 21-25, p. 15 ll. 1-3.

-3-

places available in the program fluctuates with the labor market.[19]  If unexpected construction work begins and contractors need more labor, then the program accepts more people to satisfy the demand.[20]

Upon acceptance into the program, applicants are known as "apprentices" and become members of either Local 341 or Local 942.[21]  The program's goal is to provide its apprentices with an initial round of training lasting at least two weeks.[22]  After that, apprentices are placed in jobs with contractors and receive 144 hours of additional training per year.[23]  Apprentices who begin their training in Fairbanks may be transferred to Anchorage and vice versa, although more apprentices are sent from Fairbanks to Anchorage than the reverse.[24]

The apprenticeship program's connection to this case is Abraham Milne.  He is Clark Milne's son, and Clark is the person who arbitrated a dispute between Local 341 and ASGC over ASGC's termination of an employee who was a Local 341 member.  Clark did not disclose the fact that Abraham applied to the program's Fairbanks school in June of 2004 and May of 2005 and was rejected both times.[25]  It is clear Clark knew about the first rejection before accepting the parties' arbitration offer.[26]  It is not clear he knew about the second rejection before the arbitration, which took place on June 29, 2005, or before he issued his decision upholding the termination on July 5, 2005.[27]

---

[19]*Id.*, ex. B, p. 15 ll. 4-13.

[20]*Id.*, ex. B, p. 15 ll. 16-25, p. 16 ll. 1-5.

[21]*Id.*, ex. B, p. 20 ll. 13-18.

[22]*Id.*, ex. B, p. 19 ll. 11-14.

[23]*Id.*, ex. B, p. 19 ll. 14-18.

[24]*Id.*, ex. B, p. 12 ll. 2-10.

[25]Doc. 14, ex. D.

[26]*Id.*, ex. H, affidavit of Tim Sharp, pp. 2-3 ¶¶ 6-7.

[27]Doc. 24, ex. A, p. 25 ll. 1-25, p. 26 ll. 1-11.

-4-

A conversation between Gallagher of Local 341 and Simien of Local 942 after Clark issued his decision brought Abraham's applications to the apprenticeship program to Local 341's attention. Simien was on the interview team both times Abraham applied.[28] He knew about the familial relationship between Abraham and Clark and told Gallagher about Abraham's applications to the program.[29]

Another Local 942 officer, Sharp, also knew Clark was Abraham's father and that Abraham had applied to, and been rejected by, the apprenticeship program.[30] In fact, at a volunteer event in Fairbanks after Abraham's first unsuccessful application, he happened on Clark and Abraham and told Clark to encourage Abraham to reapply.[31]

Clark's failure to disclose his son's application to the program led to this lawsuit. The union filed a complaint in this court arguing that Clark's failure to disclose that information and, in the alternative, his failure to investigate it require that his decision be vacated. ASGC maintains Abraham's application to the program was not a sufficient connection to Local 341 to require disclosure or investigation. This court has jurisdiction under 29 U.S.C. § 185.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law. The moving party has the burden to show that material facts are not genuinely disputed.[32] To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[33] Once the moving party meets its

---

[28]Doc. 14, ex. C, affidavit of Daniel Simien, p. 2 ¶ 4.

[29]*Id.*, ex. C, pp. 2-3 ¶¶ 6-7.

[30]*Id.*, ex. H, p. 2 ¶ 4.

[31]*Id.*, ex. H, pp. 2-3 ¶¶ 5-6.

[32]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[33]*Id.* at 325.

-5-

burden, the nonmoving party must demonstrate that a genuine issue exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial.[34] The court must not assess the credibility of this evidence, and must draw all justifiable inferences from it in favor of the nonmoving party.[35]

In this case, there is not a genuine dispute about any material facts, and so the question is which party is entitled to judgment as a matter of law. Both parties urge the court to apply the standard for setting aside arbitrations from cases involving contracts governed by the Federal Arbitration Act ("FAA"). Acknowledging that they are joined by a CBA and that the Ninth Circuit has held the FAA does not apply to CBAs,[36] the parties cite a Fourth Circuit decision in which the court held the standard from FAA cases may be applied to arbitrations arising from CBAs.[37] This court will apply the FAA standard because it finds the Fourth Circuit decision persuasive, there apparently is no Ninth Circuit authority on this point, and the parties have not suggested an alternative standard.

The FAA standard requires that the court vacate Clark's decision if the undisclosed fact – Abraham's applications to, and rejections by, the apprenticeship program – would create a "reasonable impression of [Clark's] partiality."[38] The burden of making that showing is on Local 341, because it is the party seeking vacatur of Clark's decision.[39]

---

[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[35] *Id.* at 255.

[36] *Poweragent, Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193, 1193 n.1 (9th Cir. 2004) (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001); *Kemner v. Dist. Council of Painting and Allied Trades No. 36*, 768 F.2d 1115, 1118 n.1 (9th Cir. 1985)).

[37] *Consolidation Coal Co. v. Local 1643, United Mine Works of Am.*, 48 F.3d 125, 128-29 (4th Cir. 1995).

[38] *Schmitz v. Zilveti*, 20 F.3d 1043, 1048-1049 (9th Cir. 1994).

[39] *Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427 (9th Cir. 1996) (citing *Sheet Metal Works Int'l Ass'n Local 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745 (9th Cir. 1985)).

## IV. DISCUSSION

Before addressing Local 341's argument, the court feels compelled to point out two propositions it depends on that are not supported by the cases the union cites. The first is that an arbitrator's evident *bias against* the party that *lost* the arbitration can serve as a basis for that party's challenge to the arbitration. The cases cited by Local 341 deal with the impression of an arbitrator's *partiality to* the party that *won* the arbitration.[40] The second is that information that must be disclosed includes a relationship between the arbitrator and a person who applied to work for one of the parties to an arbitration but was rejected. In the cited cases, the person to whom the arbitrator was related actually worked for one of the parties.[41]

The court finds both propositions are sound, despite the lack of support for them in case law. An arbitrator's apparent bias against one party is as solid a ground for challenging his decision as his evident partiality to the other party, because the impression is he would favor the second party to spite the first. Especially in cases like this one that involve a father and son relationship, the difference between actually working for one of the parties and being rejected by that party seems immaterial. The reasonable expectation is that an arbitrator/father would harbor ill will toward a party that refused to hire his son,[42] and that expectation justifies requiring the arbitrator to disclose his son's application and rejection.

With those principles in mind, the question is whether the apprenticeship program's rejection of Abraham's applications creates a reasonable impression of Clark's bias against Local 341. Such an impression of bias would be arise in two situations: (1) if the apprenticeship program and the training school that operates it are so closely associated with Local 341 that any action by them would be imputed to the

---

[40]*See, e.g., Schmitz*, 20 F.3d at 1044.

[41]*See, e.g., Consolidation Coal Co.*, 48 F.3d at 127.

[42]For example, in *Morelite Construction Corp. v. New York City District Council Carpenters Benefits Funds*, the Second Circuit expressed its "strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers." 748 F.2d 79, 84 (2d Cir. 1984). This court finds the opposite also is true.

-7-

local; and (2) if a successful application to the program's Fairbanks school likely would have led to Abraham's membership in Local 341.

The record clearly does not establish the first situation. There is no reason to impute the school and program's actions to Local 341 because they are directed by an employee of the school and not Local 341; receive their funding from a statewide union fund and not Local 341's coffers; and are overseen by a board with three times as many members from organizations other than Local 341 (six) as from Local 341 (two). Moreover, in this case the union face of the school and program was not Local 341 but Local 942, by virtue of the fact one of its officers, Simien, interviewed Abraham both times he applied, and another officer, Sharp, encouraged him to re-apply after his first application failed.

As for the second situation, the record does not allow any conclusion to be drawn about the likelihood that a successful application to the Fairbanks school would have led to Abraham joining Local 341. The record shows the Fairbanks school is within Local 942's geographic boundaries and the Anchorage school is within Local 341's territory; an apprentice who enters the Fairbanks school may be transferred to Anchorage; the net flow of apprentices is from Fairbanks to Anchorage; and apprentices join locals. The record does not show what percentage of persons who start as apprentices in Fairbanks move to Anchorage nor whether those who do move then join Local 341. If a successful application in Fairbanks were likely to lead to Abraham's membership in Local 341, it would be easier to understand why the program's rejections of his applications would create an impression of Clark's bias against Local 341. Were Local 942 the likely destination, then it would be harder to explain why the rejections would create an impression of Clark's bias against Local 341. The burden was on the union to develop a record that would show a reasonable impression of bias against Local 341, but it has not done so.

Besides arguing Clark had a duty to disclose his son's applications to the apprenticeship program, Local 341 also contends he had a duty to investigate those applications. However, given the court's conclusion that Clark had no duty to disclose that information, he could not have been under a duty to investigate it.

-8-

## V. CONCLUSION

For the reasons set out above, the motion at docket 13 is **DENIED**, and the motion at docket 20 is **GRANTED**.

DATED at Anchorage, Alaska, this 20th day of June, 2006.


/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT COURT JUDGE